### John R. CRONIN, Plaintiff,

v.

### THE ISLAMIC REPUBLIC OF IRAN, et. al., Defendants.

### No. CIV.A. 99–2890(RCL).

United States District Court, District of Columbia.

Dec. 18, 2002.

---

Elizabeth Renee Dewey, Louis J. Rouleau, Piper Rudnick, LLP, Washington, DC, for Plaintiff.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This personal injury action against the Islamic Republic of Iran ("Iran") and the

Iranian Ministry of Information and Security ("MOIS") arises from a deplorable act of state-sponsored terrorism. The plaintiff, John R. Cronin, alleges that in November 1984, when he was a graduate student in Beirut, Lebanon, he was kidnapped at gunpoint from a hospital by members of Amal, Islamic Amal, and Hizbollah. Cronin contends that these paramilitary groups were organized, funded, trained, and controlled by the defendants. He further alleges that after being taken to the headquarters of Amal, he was repeatedly beaten, interrogated, and threatened. When he was released four days later, he alleges that he was near death, not able to even stand on his own.

Cronin brought this action under the Foreign Sovereign Immunities Act ("FSIA") of 1976, 28 U.S.C. §§ 1602–1611. The FSIA grants federal courts jurisdiction over suits involving foreign states and their officials, employees, and agents in certain enumerated instances. One instance is claims of personal injury or wrongful death resulting from acts of state-sponsored terrorism. 28 U.S.C. § 1605(a)(7). The FSIA explicitly eliminates foreign governments' sovereign immunity in suits for money damages based on acts of torture, hostage taking, or the provision of material support for such acts. *Id.*

The defendants have failed to enter an appearance in this matter despite being properly served with process. 28 U.S.C. § 1608. As a result, the Court entered default against them under 28 U.S.C. § 1608(e). Before a judgment of default may be entered against a foreign state, however, the plaintiff must "establish[ ] his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). Thus, the Court held a hearing to receive evidence from the plaintiff. Again, the defendants failed to appear.

Based upon the extensive evidence presented and the applicable law, the Court concludes that the plaintiff has established his right to relief, and that a default judgment is merited. The Court further finds that the plaintiff is entitled to compensatory and punitive damages. The Court's findings of fact and conclusions of law are set forth below.

## I. FINDINGS OF FACT

The following findings of fact are based upon the sworn testimony and documents entered into evidence at the hearing held pursuant to 28 U.S.C. § 1608(e). The Court finds the following facts to be established by clear and convincing evidence, which would have been sufficient to establish a prima-facie case in a contested proceeding.

## A. Background Information

John R. Cronin was born in Fort Knox, Kentucky on November 8, 1946, and has been a United States citizen since that date. Tr. at 15. In 1966, at the age of nineteen, he enlisted in the Marines. *Id.* While in the Marines, Cronin served two tours in Vietnam. Tr. at 16. During his first tour, he was shot in the abdomen by a North Vietnamese soldier when his unit was ambushed in an area outside of Da Nang. Tr. at 17. Because of his injuries, he had to undergo a laparotomy and "an end-to-end ileostomy where they sewed the intestine back together again because quite a bit of it had been removed." Tr. at 17; Ex. 8 at CR–00128. Although he was not required to return to combat, he voluntarily went back to Vietnam for a second tour after recovering from his injuries. Tr. at 17–18. Cronin was honorably discharged from the Marines in 1969, having been awarded two Purple Hearts for bravery and several other prestigious military awards. Exs. 4 and 5.

As a result of the gunshot wound to his abdomen, Cronin suffers from recurring bouts of small bowel obstruction. Tr. at 19. Dr. Kevin Weaver, his treating physician, explained that the bowel obstruction is caused by scar tissue around the areas of the intestine where surgeons operated, and that occasionally his intestine will swell up and prevent "the material that's in the intestine" from "mov[ing] through[.]" Ex. 3 at 5–8. Dr. Weaver testified that bowel obstructions, such as those experienced by Cronin, are "very painful." Ex. 3 at 9. Fortunately, such bowel obstructions do not require surgery, and are treated with a short hospital stay in which the patient receives intravenous fluids while his stomach is drained. *Id.* (noting that the fluids and lack of oral ingestion allow the intestine to rest and the swelling to go down). *See also* Tr. at 19 ("[I]t had always been resolved by placing a tube down through the esophageal track and down into the stomach and then draining the stomach for about four days."). The failure to receive treatment, however, can be deadly because the obstruction prevents a person from ingesting food or water orally. Ex. 3 at 9. Dr. Weaver also explained that "[w]ith not treating it properly, the bowel obstruction will continue to get worse. The person will get dehydrated. The swelling in the intestine gets progressively worse." Ex. 3 at 14.

After leaving the Marines, Cronin received a bachelor's degree in political science from the Citadel, a master's degree in Middle East studies from the American University in Beirut ("AUB"), and a PhD in Middle East politics from the School of Oriental and African Studies at the University of London. Tr. at 15, 58–59; Ex. 6. During the course of his studies, he spent significant time living in the Middle East, including Cairo, Egypt and Beirut, Lebanon. As a result, Cronin spoke Arabic quite well in the early 1980s. Tr. at 24. By virtue of his knowledge, education, training, and experience, Cronin can fairly be characterized as an expert in Middle East affairs. In fact, he currently teaches comparative politics and Middle East affairs at Strayer University in Virginia. Tr. at 15, 59.

## B. Cronin's Abduction and Torture

In 1984, Beirut was a city in turmoil, dominated by various religious and political factions vying for influence and power. Tr. at 26–27 ("There were bombings in the city itself. There were assassination[s]. There were kidnappings. It really was complete chaos."). AUB, located in west Beirut, was not immune from the religious and political strife occurring outside its walls. *Id.* As Thomas Sutherland, acting President of AUB in 1984 noted, "[w]ell by late 1984, things had been pretty much on the boil for quite a while. There was a lot of unrest. There was a lot of fighting even on the campus from time to time." Ex. 12 at 11.[1] In fact, Amal, Islamic Amal, and Hizbollah were "all either represented on campus or certainly well represented in the environs of the university." Tr. at 27.

Cronin was a graduate student at UAB in 1984. While at UAB he was threatened several times, and testified that he "was marked from day one" because he was an American. Tr. at 25. He was accused by other students of being with "American Intelligence," and was even told by the leader of the Hizbollah faction on campus to "watch [his] step because we are watching you very carefully[.]" Tr. at 27.

---

**1.** Professor Sutherland's own horrific experience as a hostage in Lebanon is recounted in *Sutherland v. Islamic Republic of Iran,* 151 F.Supp.2d 27 (D.D.C.2001).

On the morning of November 16, 1984, Cronin felt a "twinge" in his upper abdominal region, which he suspected to be the onset of a bowel obstruction. Tr. at 29. An hour later, when the pain intensified, he was certain that he was suffering from a bowel obstruction. *Id.* Having experienced several episodes of bowel obstructions in the past, he knew that the obstruction could only be remedied through medical treatment and hospitalization. Tr. at 19–20. Cronin walked hunched over from the pain about four blocks to the AUB Medical Center, the University's hospital. Tr. at 29.

While a physician was examining Cronin, four armed men burst into the emergency room and walked over to the table where he was being examined. Tr. at 30–31. One man placed a Togerov pistol under Cronin's ear and said in Arabic "get up, you are coming with us." Tr. at 31. The doctor and nurse pleaded with the other three men, who were carrying AK–47 assault rifles, not to take him because his condition was "very serious." Tr. at 30–31. In response, one of the men pointed his weapon at the doctor and said that Cronin was an Israeli spy and was going with them. *Id.*

Cronin recognized two of the abductors as members of Hizbollah because of the distinctive red headbands they were wearing. Tr. at 31 (noting that only Hizbollah members wore this particular red headband with a saying from the Koran written across it in Arabic.). He also knew that the other two men were members of Islamic Amal because of the distinctive leather jackets that they were wearing. Tr. at 31 (stating that black leather jackets were "standard fare for Islamic Amal in those days."). The various factions operating in Lebanon were identifiable by their attire. Tr. at 32.

The men forced Cronin into the back seat of a car parked outside the hospital. Tr. at 32. As they drove off, one of the men accused him of being an Israeli spy and said that they were going to put him on trial for espionage. Tr. at 34–35. After Cronin denied that he was a spy, another abductor ordered him to sit on his hands and then began punching him in the abdomen. Tr. at 34. Cronin explained that the man "would take his left fist and hit me as hard as he could in the upper abdominal region. If I moved my hands up, he'd hit me in the face . . . ." *Id.* The man repeatedly hit him "exactly where the small bowel obstruction was." *Id.* At one point the man pointed his AK–47 rifle at Cronin's head and said over and over "you are dead. We've got you now. You are an Israeli spy and you are ours." *Id.* After a further exchange of words, the man turned the rifle around and hit Cronin on the side of his head with the butt, creating a long gash over his right eye. Tr. at 35; Ex. 3.

After riding in the car for about thirty minutes, the car stopped at what was later identified as Amal headquarters. Tr. at 39. Cronin could no longer stand because of the pain caused by the bowel obstruction and the beating he received in the car. *Id.* After being kicked and punched in the face yet again, Cronin was taken into the building. *Id.* After spending a short time in a room with a man who identified himself as a security officer for Amal, Cronin was carried down to a cell area in the basement of the headquarters. Tr. at 41–42. He was thrown onto the floor of a cell and left. Tr. at 42.

The prison cell was about twenty feet by twenty feet and held approximately twenty-five prisoners. Tr. at 42. The cell door was thick metal with bars. *Id.* There were no windows, and the only light was from a single light bulb hanging from the ceiling. *Id.* The bathroom was a hole in

the ground. *Id.* Even though the cell was cold, no blankets were provided to the prisoners. Tr. at 44. Cronin spoke to some of the prisoners and learned that half of them were members of Amal who had violated the group's policies. Tr. at 43.

While held captive Cronin was severely beaten numerous times. Tr. at 43. He explained that guards in teams of two or three would enter the cell, and one guard would ask him questions like "what are you doing here? Why were you in Israel? Are you CIA? Are you with Mossad, the Israeli intelligence agency[?]" Tr. at 43–44. The other guards would proceed to punch him repeatedly in the abdominal region until he could no longer stand, and then they would proceed to kick him as he lay on the ground. Tr. at 44. In addition to his own beatings, Cronin was forced to witness other prisoners being savagely beaten. Tr. at 48.

Cronin's physical condition, already greatly weakened by the bowel obstruction, deteriorated even further during his captivity. It was so bad that he could not even sit or stand up on his own by the second day. Tr. at 44. By the third day, he explained that:

> I was contorted in sort of a fetal position because I couldn't straighten up. It was the only position where I was not vomiting. It was very difficult to breathe. I could not drink or eat anything. I had not been able to eat or drink anything since I had gotten into the hospital so, of course, I was dehydrat[ed]. My electrolytes were well out of balance so I was starting to hallucinate a bit.

Tr. at 44. Although he was brought some food, he could not eat it, and, as a result, the guards stopped bringing food to him after the second day. Tr. at 45. He tried, with the assistance of one of the other prisoners, to drink some water on the third day but was unable to keep it down. *Id.*

His physical condition had deteriorated so much by the third day that he was brought to and examined by a local doctor. Tr. at 46. Cronin explained to the doctor that he had a bowel obstruction. The doctor stated that he could not help him because he did not have a vacuum pump, which could be used to withdraw to material blocked in the abdomen. *Id.* The doctor did not even have pain medication to give to him. *Id.* After finishing talking to Cronin, the doctor spoke with the men who had escorted him there. *Id.* The doctor was shaking his head, which Cronin understood to mean that he could not help. *Id.* The men brought Cronin back to headquarters and threw him into the cell in which he had previously been held captive. *Id.*

In addition to a deteriorating physical condition, Cronin's situation adversely affected his mental state as well. He testified that:

> I had no hope of having [the bowel obstruction] resolved anytime soon so there was a psychological problem here of this lack of knowledge, and on top of that, I had never been hit in the stomach [while experiencing a bowel obstruction], and so it felt like [my] stomach was swelling up and it was very very hard to breathe. That worried me too because I had never had any sort of respiratory problem accompany this before ... Then the subsequent beatings every evening, morning, and afternoon. Again just not knowing what my fate was going to be. It was a very difficult time.

Tr. at 48–49. Moreover, on the third day he was forced to attend a prayer meeting at which he was told that "we will convert you yet." Tr. at 47. Cronin testified that the meeting was "a dreadful affair." *Id.*

Suddenly, and without any explanation, Cronin was returned to AUB Medical Center late in the evening on November 20, 1984. Tr. at 49; Ex. 7. On the way to the hospital, Cronin was warned not to say anything about his captivity or else they would come back for him. Tr. at 50. By the time he arrived at the hospital, Cronin was near death. Tr. at 52. In fact, a doctor stated that he would have died after two more days of captivity because of his inability to hydrate. *Id.* Perhaps the best description of his condition came from Professor Sutherland: "I have seen some boxing matches in the last two or three years and guys get punched around quite a bit but they never end up even remotely looking like John Cronin was. He was a big, big, mess. They had obviously worked him over very, very, severely." Ex. 13 at 17.

Doctors attempted to resolve his bowel obstruction in the "normal way." *Id.* Cronin testified that "they put a tube in through the esophageal track and so on but nothing was able to be withdrawn." *Id.* A doctor explained at the time that his abdomen "may be so swollen that we can't pull anything out." Tr. at 51. Because the "normal" treatment proved ineffectual, doctors had to surgically remove the obstruction. Tr. at 51; Ex. 3 at 15; Ex. 7 at CR–00048. Dr. Weaver opined, however, that "it is very likely that [Cronin] would have responded appropriately as he had in previous years with conservative therapy ... had he not received the beating and also been deprived standard medical care." Ex. 3 at 14–17. Cronin was discharged from the AUB Medical Center on December 1, 1984. Ex. 7 at CR–00002; Ex. 3 at 18.

## C. The Role of Iran and the MOIS

The Court has no difficulty concluding that Amal, Islamic Amal, and Hizbollah

carried out the heinous acts recounted above. Before making specific findings regarding the defendants' involvement with these organizations, however, the Court will briefly describe the three groups that performed these depraved acts.

Amal, which means "hope," was established in the 1970s as an organization representing the interests of the Shia community in Lebanon. Ex. 2 at 7. Initially, Amal did not pursue an anti-Western agenda and did not engage in the type of conduct described above. *Id.* In the early 1980s, however, Amal became a much more radical organization and began carrying out terrorist attacks. Ex. 2 at 15 (noting that in the 1980s Amal began to engage in terrorist acts such as kidnappings and hijackings). As Dr. Clawson explained, "[m]any in the Shia community are impressed by the Iranian revolution [of 1979], and became radicalized as a result of that revolution and the Israeli invasion [of Lebanon in 1982]." *Id.* at 8. Islamic Amal, a splinter group of Amal, was formed around 1982 by more radical members of the Shia community. Ex. 2 at 9. Islamic Amal was "actively engag[ed]" in terrorist activities such as kidnappings and hijackings during the 1980s. Ex. 2 at 15–16. Hizbollah, which means "party of god," was established in the early 1980s, and from its inception has been a radical organization within ·the Shia community. Ex. 1; Ex. 2 at 11–12. Hizbollah also regularly participated in hostage takings and plane hijackings. Ex. 2 at 15–16. Dr. Clawson explained that these three groups intentionally carried out terrorist acts, like taking individuals hostage, to end American cultural influence and create an Islamic state in Lebanon. Ex. 2 at 21.

The testimonial and documentary evidence presented by the plaintiff conclusively proves that Iran was pervasively involved with and provided material sup-

port to Amal, Islamic Amal, and Hizbollah. This support, in the form of funding, training, and direction, enabled these groups to kidnap Cronin in November 1984. Ambassador Robert Oakley explained that "[t]he Iranians came in and organized Hezbollah out of several small Shi'a organizations, including Islamic Amal. The Iranians provided money, they provided advice, they provided advisors. They also provided muscle." Ex. 1 at 13–14. Similarly, Dr. Clawson explained that "the Iranians decided early on that they would have to split [Amal] rather than moving the whole group to become more radical." Ex. 2 at 9–10. Ambassador Oakley indicated that "Islamic Amal was [in fact] really part of Hezbollah, tightly associated with Hezbollah, again backed by the Iranians." Ex. 1 at 16. Iran also sent agents to Lebanon to radicalize Amal at this time. Ex. 2 at 8. As a result of these actions and other efforts at supporting terrorist activities in the Middle East, Iran was designated as a state-sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979, 50 U.S.C.App. § 2405(j), on January 19, 1984. It has been designated as such ever since. Further, Iran continues to spend approximately $150 million annually promoting terrorist activities. Ex. 2 at 26–27.

The MOIS is the Iranian intelligence service, functioning both within and beyond the territorial borders of Iran. Formerly the secret police force (SAVAK) under the Shah, the MOIS is the branch of the Iranian government that oversees spy operations and deals with terrorist organizations domestically and abroad. Ex. 1 at 13–14; Ex. 2 at 22–23. Acting as an agent of Iran, the MOIS provided Amal, Islamic Amal, and Hizbollah with funding, training, equipment, and advisors to carry out terrorist activities such as the kidnapping and torture of Cronin. *Id.* Indeed, when asked about the MOIS's involvement with

Hizbollah, Ambassador Oakley explained that "they were the one who managed this entire operation." Ex. 1 at 13–14. Dr. Clawson further noted that the MOIS's personnel trained Hizbollah members how to interrogate and hold hostages, and assisted Amal and Islamic Amol in doing the same. Ex. 2 at 22–23. Moreover, much of the money Iran gave to Amal, Islamic Amal, and Hizbollah was distributed by the MOIS. Ex.1 at 13–14.

## II. CONCLUSIONS OF LAW

### A. Jurisdiction

 Actions against a foreign state or an agent of a foreign state must be brought under the FSIA. *Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 10 (D.D.C.1998). The FSIA provides that foreign states are immune from suit in United States courts except in certain enumerated instances. *Saudi Arabia v. Nelson,* 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993) (noting that "[u]nder the [FSIA], a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state."). Beginning in the mid–1980s, victims of terrorist acts sought unsuccessfully to sue Iran for its role in the attacks. *See, e.g., Cicippio v. Islamic Republic of Iran,* 30 F.3d 164 (D.C.Cir.1994); *Persinger v. Islamic Republic of Iran,* 729 F.2d 835 (D.C.Cir.1984). In those cases, the courts held that the plaintiffs' claims against Iran did not fall under one of the exceptions, and Iran was therefore immune from suit. *Id.*

In 1996, however, Congress added to the list of enumerated exceptions by explicitly abrogating the sovereign immunity of foreign states that commit or cause others to commit acts of terrorism. 28 U.S.C.

§ 1605(a)(7). In particular, section 1605(a)(7) provides that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States in any case ... in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, ... hostage taking, or the provision of material support or resources ... for such an act[.]" Section 1605(a)(7) further provides that the foreign state must be "designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979," and that the claimant or victim must be a "national of the United States ... when the act upon which the claim is based occurred." Here, there is no question that Cronin's claims fall within the ambit of the state-sponsored terrorism exception to foreign sovereign immunity, 28 U.S.C. § 1605(a)(7). Moreover, pursuant to 28 U.S.C. § 1330(a), district courts "have original jurisdiction ... of. any nonjury civil action against a foreign state ... as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity under sections 1605–1607 of this title[.]" 28 U.S.C. § 1330(a). *See also Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989).

■ The FSIA also governs when district courts have *in personam* jurisdiction over foreign states. The statute provides that a district court will have personal jurisdiction over a foreign state defendant if the plaintiff establishes the applicability of an exception to immunity and service of process has been effectuated pursuant to 28 U.S.C. § 1608. *Elahi v. Islamic Republic of Iran,* 124 F.Supp.2d 97, 106 (D.D.C.2000) (citing *Foremost–McKesson v. Islamic Republic of Iran,* 905 F.2d 438, 442 (D.C.Cir.1990) ("Personal jurisdiction under FSIA exists so long as subject mat-

ter jurisdiction exists and service of process has been properly made pursuant to 28 U.S.C. § 1608.")). As the Court discusses more fully below, Cronin has amply demonstrated that section 1605(a)(7) of the FSIA applies to his action, and that service of process was properly accomplished pursuant to section 1608.

Notwithstanding the above analysis, the Court must still determine whether Cronin has a cause of action against Iran and the MOIS under the FSIA. As this Court explained in *Flatow,* "[a]lthough [section 1605(a)(7) ] created a forum competent to adjudicate claims arising from offenses of this nature, serious issues remained, in particular, the causes of action available to plaintiffs." *Flatow,* 999 F.Supp. at 12. *See also Elahi,* 124 F.Supp.2d at 106 (noting that section 1605(a)(7) "merely waived the sovereign immunity of state sponsors of terrorism[,]" it did not create a cause of action against them.).

To create a cause of action for victims of state-sponsored terrorist acts, Congress passed an amendment to section 1605(a)(7) entitled "Civil Liability for Acts of State Sponsored Terrorism." Pub.L. No. 104–208, § 589, 110 Stat. 3009 (1996) (codified at 28 U.S.C. § 1605(a)(7) note). This provision, commonly referred to as the "Flatow Amendment," after a victim of a bus bombing named Alisa Flatow, provides that "[a]n official, employee, or agent of a foreign state designated as a state sponsor of terrorism ... while acting within the scope of his or her office, employment, or agency shall be liable to a United States national ... for personal injury or death caused by acts of that official, employee, or agent for which the court of the United States may maintain jurisdiction under section 1605(a)(7)[.]" 28 U.S.C. § 1605(a)(7) note. The Flatow Amendment thus clearly establishes a cause of action against an "official, employee, or

agent" of a foreign state, such as the MOIS, that commits or causes another to commit a terrorist act. *Flatow*, 999 F.Supp. at 12–13; *Elahi*, 124 F.Supp.2d at 106. It is not as clear from the text of the Flatow Amendment, however, that victims of state-sponsored terrorist acts also have a cause of action against the foreign state itself. *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 87 (D.C.Cir.2002) (recognizing that "the amendment does not list 'foreign states' among the parties against whom such an action may be brought."). In *Price*, the Court of Appeals flagged the issue for this Court to consider on remand.[2] *Id.* Although the issue is not yet properly before the Court in *Price*, to the extent the precise issue is before the Court here prudence dictates that the Court address it.

■ After carefully reviewing the FSIA, the Court holds that the Flatow Amendment does provide victims of state-sponsored acts of terrorism with a cause of action against the culpable foreign state. There are three reasons why the Court reaches this conclusion. First, the text of the Flatow Amendment suggests, although admittedly does not explicitly state, that a cause of action exists against foreign states proper. Before addressing the text of the Flatow Amendment, however, it is important to recognize that the provision must be read in conjunction with 28 U.S.C. § 1605(a)(7). *Flatow*, 999 F.Supp. at 13 (noting that the Flatow Amendment "should be considered to relate back to the

enactment of 28 U.S.C. § 1605(a)(7) as if they had been enacted as one provision, and the two provisions should be construed together and in reference to one another."); *Id.* at 12 (observing that "[t]he Flatow Amendment is apparently an independent pronouncement of law, yet it has been published as a note to 28 U.S.C. § 1605(a)(7), and requires several references to [that provision] to reach even a preliminary interpretation."). "The operative language of 28 U.S.C. § 1605(a)(7) parallels the definition of respondeat superior: an employer is liable is some cases for damages 'proximately resulting from acts of [an] employee done within [the] scope of his employment in the employer's service.'"[3] *Flatow*, 999 F.Supp. at 26 (footnote omitted). Thus, under 28 U.S.C. § 1605(a)(7), the sovereign immunity of a foreign state will be abrogated if its "official, employee, or agent" provides material resources to the entity that commits the terrorist act. The Flatow Amendment likewise provides that an "official, employee, or agent" of a foreign state shall be liable if their actions were taken "while acting within the scope of his or her office, employment, or agency[.]" 28 U.S.C. § 1605(a)(7) note. In light of the identical language used in both statutory provisions, the Court finds that the respondeat superior implications of section 1605(a)(7) are equally applicable to the Flatow Amendment. Thus, in *Flatow*, the Court opined that "[t]he state sponsored terrorism exception to immunity and the Flatow Amendment similarly employ the princi-

---

**2.** In *Price*, the Court of Appeals also noted that "it is possible that such an action could be brought under the 'international terrorism' statute, 18 U.S.C. § 2333(a)[.]" *Price*, 294 F.3d at 87. The problem with invoking that statutory provision is 18 U.S.C. § 2337 explicitly provides that "[n]o action shall be maintained under section 2333 of this title against ... a foreign state, an agency of a foreign state, or an officer or employee of a foreign

state or an agency thereof acting within his or her official capacity or under color of legal authority."

**3.** 28 U.S.C. § 1605(a)(7) provides that "if such act or provision of material resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his office, employment or agency."

ples of *respondeat superior* and command responsibility to create both subject matter jurisdiction and a federal cause of action." *Flatow*, 999 F.Supp. at 26. Moreover, by referring to officials, employees, and agents of foreign states, the Flatow Amendment makes clear that they can, in addition to the foreign state itself, be held liable for providing material support to groups that perform terrorist acts. *See, e.g., Flatow*, 999 F.Supp. at 24–25 (noting that the Flatow Amendment "overrides the common law doctrine of head of state immunity[.]"). When viewed in this light, it becomes clear that the omission of "foreign state" from the Flatow Amendment is the beginning, rather than the end, of the inquiry. It also shows that to interpret the text of the Flatow Amendment as denying a cause of action against the foreign state itself would turn the scheme of § 1605(a)(7) on its head. Instead of using the acts of officials, employees, and agents to support liability against the foreign state, the same language would be used in the Flatow Amendment to deny victims of state-sponsored terrorism a cause of action against the responsible foreign state.

Second, the legislative history of 28 U.S.C. § 1605(a)(7) and the Flatow Amendment support the conclusion that victims of state-sponsored acts of terrorism have a cause of action against the foreign state itself. "The stated purpose[s] of the Antiterrorism Act [are] to deter terrorist acts against U.S. nationals by foreign sovereigns or their agents and to provide for justice for victims of such terrorism." *Elahi*, 124 F.Supp.2d at 106 (citing 110 Stat. 1214 (1996)). *See also Flatow*, 999 F.Supp. at 12–13 ("The brief explanation of the Flatow Amendment's purpose in the House Conference Report explicitly states that it was intended to

increase the measure of damages available in suits under 28 U.S.C. § 1605(a)(7).") (citing H.R. Conf. Rep. 863, 104th CONG, 1996). These stated intentions would both be thwarted by construing the Flatow Amendment in a manner that precludes victims of· terrorism from bringing suit against the responsible foreign states. At the same time, the purposes of the legislation would clearly be advanced by victims having a cause of action against the responsible foreign state. Indeed, to construe the Flatow Amendment as not conferring a private cause of action against foreign states would mean that what Congress gave with one hand in section 1605(a)(7) it immediately took away with the other in the Flatow Amendment.

Finally, relevant statutory provisions enacted after the Flatow Amendment also support the conclusion that it gives victims of state-sponsored acts of terrorism a cause of action against the responsible foreign state. For example, the Victims of Trafficking and Violence Protection Act of 2000 ("Victims Protection Act") provides a mechanism by which successful plaintiffs can recover their damage awards against foreign states and their agents from the United States government. P.L. No. 106–386, 114 Stat. 1464 (2000). It is inconceivable that Congress would enable plaintiffs who obtained judgments against foreign states like Iran to recover the damage awards from the United States if the plaintiffs did not have a cause of action against the foreign state in the first place.[4] Moreover, the legislative history of the Victims Protection Act indicates that Congress presumes the 1996 changes to the FSIA confers a private right of action against foreign states. *See, e.g.*, H.R. Conf. Rep. 939, 106th CONG, 2000 (stating that the 1996 amendments allowed "American citi-

---

**4.** The Victims Protection Act even explicitly mentions Iran. *Flatow v. Islamic Republic of Iran,* 305 F.3d 1249, 2002 WL 31245261 at *6 (D.C.Cir. October 8, 2002).

zens injured or killed in acts of terrorism (or their survivors) to bring a lawsuit against the terrorist state responsible for that act."); 146 Cong. Rec. S10164-02 (stating that the 1996 amendments "gave American victims of state-sponsored terrorism the right to sue the responsible state."). In addition, Congress amended 28 U.S.C. § 1606 in 1998 to permit victims to recover punitive damages against foreign states in actions brought pursuant to § 1605(a)(7). P.L. 105-277, 112 Stat. 2681-491 (1998) ("[A] foreign state except an agency or instrumentality thereof shall not be liable for punitive damages, except any action under section 1605(a)(7)[.]"). It seems highly unlikely that Congress would amend § 1606 to specifically permit punitive damage awards against foreign states under § 1605(a)(7) if a cause of action did not exist against those states. Furthermore, Congress repealed the amendment to § 1606 in 2000 after plaintiffs had recovered substantial punitive damage awards against foreign states like Iran. *Elahi*, 124 F.Supp.2d at 113-14 n. 17 (citing P.L. No. 106-386, § 2002(f)(2)). It is even more implausible that Congress would amend that provision a second time by eliminating punitive damage awards against foreign states if victims did not have a cause of action against those foreign states at all.

In holding that victims of state-sponsored terrorist attacks have a cause of action against the culpable foreign state under the FSIA, this Court joins virtually every district judge in this circuit who has addressed the issue. *See, e.g., Surette v. Islamic Republic of Iran*, 231 F.Supp.2d 260 (D.D.C.2002) (Friedman, J.); *Daliberti v. Republic of Iraq*, 146 F.Supp.2d 19 (D.D.C.2001) (Oberdorfer, J.) *Elahi*, 124 F.Supp.2d at 106 (Green, J.); *Higgins v. Islamic Republic of Iran*, Civ. A. No. 1:99cv00377, 2000 WL 33674311 (D.D.C. 2000) (Kollar-Kotelly, J.); *Cicippio v. Islamic Republic of Iran*, 18 F.Supp.2d 62 (D.D.C.1998) (Jackson, J.). *But see Roeder v. Islamic Republic of Iran*, 195 F.Supp.2d 140, 171-73 (D.D.C.2002) (Sullivan, J.).

## B. Liability

■ In light of the findings of fact made above, the Court easily concludes that the defendants are liable under the FSIA. Cronin has proved all the requirements of 28 U.S.C. § 1605(a)(7) by clear and convincing evidence. The injuries he sustained were caused by his being taken hostage and tortured by Amal, Islamic Amal, and Hizbollah. The Court finds that he was "taken hostage," for purposes of the FSIA,[5] because his abduction was part of Amal, Islamic Amal, and Hizbollah's general effort to influence American policy in Lebanon. The Court also finds that Cronin was "tortured," for purposes of the FSIA,[6] because Amal, Islamic Amal, and Hizbollah inflicted severe pain upon him to get him to confess to being a spy.

---

5. The FSIA defines hostage taking as follows: "Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person in order to compel a third party, namely a State ... to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offense of taking hostages[.]" The FSIA derives this definition from article 1 of the International Convention Against the Taking of Hostages. 28 U.S.C. § 1605(e)(2).

6. The FSIA defines torture as "any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering ... is intentionally inflicted on that individual for such purposes as obtaining from that individual ... information or a confession, punishing that individual for an act that individual ... has committed or is suspected of having committed[.]" The FSIA derives this definition from section 3 of the Torture Victim Protection Act of 1991. 28 U.S.C. § 1605(e)(1).

Either one of these findings would support a finding of liability. The Court is also absolutely convinced that the defendants, Iran and the MOIS, provided material support and resources (in the form of training, funding, and direction) to Amal, Islamic Amal, and Hizbollah. This assistance undoubtedly enabled these groups to take Cronin hostage and torture him In addition, as required by the FSIA, Iran was designated as a state-sponsor of terrorism at the time Cronin was taken hostage and tortured, and at the time of his abduction Cronin was a United States national. Finally, there is no question that if officials of the United States engaged in the same conduct they would be liable in a personal injury action. *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

## C. Damages

The FSIA explicitly permits plaintiffs to pursue "money damages which may include economic damages, solatium, pain, and suffering, and punitive damages if the acts were among those described in section 1605(a)(7)." 28 U.S.C. § 1605(a)(7) note. After reviewing the arguments presented by the plaintiff, and the law applicable thereto, the Court makes the following conclusions regarding damages.

### 1. *Compensatory Damages*

Although calculating damages is hard in many cases, doing so is especially difficult in cases involving terrorist attacks. Indeed, the Court recently observed that "there is no market where pain and suffering are bought and sold, nor any standard by which compensation for it can be definitely ascertained, or the amount actually endured can be determined[.]" *Weinstein v. Islamic Republic of Iran*, 184 F.Supp.2d 13, 22 (D.D.C.2002) (quoting *St. Louis*

*S.W.R. Co. v. Kendall*, 114 Ark. 224, 169 S.W. 822, 824 (1914)). In cases where the plaintiff was held hostage, courts typically have awarded compensatory damages on a per diem basis. *See, e.g., Jenco v. Islamic Republic of Iran*, 154 F.Supp.2d 27, 37 (D.D.C.2001); *Daliberti*, 146 F.Supp.2d at 25. "This formula grants the former hostage roughly $10,000 for each day of his captivity." *Jenco*, 154 F.Supp.2d at 37. Thus, for example, the estate of Father Lawrence Jenco, who was held hostage for 564 days, received $5,640,000 in compensatory damages. *Id.*

This formula has not been applied in every hostage taking case brought under the FSIA, however. In several cases, the Court has adjusted the amount of the per diem award based on the severity of the maltreatment suffered by the plaintiff, while in other cases the Court has not applied a per diem approach at all because of the brevity of the captivity. *See, e.g., Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 87–89 (D.D.C.2002) (awarding plaintiff severely beaten over a fifteen hour period $500,000 for that pain and suffering); *Higgins*, 2000 WL 33674311 at *8 (awarding approximately $57,000 per day of captivity to family of Army colonel held by Hezbollah for 529 days prior to being executed.); *Hill v. Republic of Iraq*, 175 F.Supp.2d 36, 48 (D.D.C.2001) (awarding Americans held by Iraq prior to Desert Storm between $3,000 and $5,000 per day of captivity and lump sum awards for psychological injuries between $100,000 and $500,000).

In light of the severity of his beatings (which were greatly exacerbated by his bowel obstruction) and the brevity of confinement (four days), the Court finds that the per diem approach is not appropriate in this case. Indeed, it would be a perverse application of the formula to find that Cronin is only entitled to $40,000. *Cf.*

*Langevine v. District of Columbia,* 106 F.3d 1018 (D.C.Cir.1997) (upholding a jury verdict for $200,000 for pain and suffering resulting from a false arrest and detention in a D.C. police station that lasted no more than a day). Such a small award would not only utterly fail to compensate Cronin for his injuries; it would essentially reward those that committed these heinous acts for beating him so severely over such a short period of time that he either had to be released after just a few days or he would have died. Therefore, using other cases brought under the FSIA as a benchmark, the Court finds that a lump sum award of $1,200,000 is appropriate in this case. The defendants shall be jointly and severally liable for this amount. *Jenco,* 154 F.Supp.2d at 40.

### 2. *Punitive Damages*

Cronin also seeks punitive damages against the MOIS. Punitive damages are awarded to punish a defendant for particularly egregious conduct, and to serve as a deterrent to future conduct of the same type. Restatement (Second) Torts, § 908. The FSIA specifically provides courts with the power to award punitive damages against an agency or instrumentality of a foreign state in a case brought under section 1605(a)(7). 28 U.S.C. § 1606. In this case, the Court finds that both of these requirements are easily satisfied. Cronin brought this action pursuant to 28 U.S.C. § 1605(a)(7), and the Iranian Ministry of Information and Security is an agency or instrumentality of the Islamic Republic of Iran for purposes of the FSIA. *Elahi,* 124 F.Supp.2d at 113; 28 U.S.C. § 1603(b) (defining an agent as an "organ of a foreign state or political subdivision thereof.").

■ Having determined that the FSIA authorizes it to award punitive damages, the Court must now decide whether they are warranted in this case. The Restate-ment (Second) of Torts provides that punitive damages are merited in cases involving "outrageous conduct." Here, the Court has no difficulty finding that the depraved and uncivilized conduct of the Iranian Ministry of Information and Security constitutes "outrageous" conduct. The defendant organized, trained, and funded Amal, Islamic Amal, and Hizbollah so that the organizations could torture and take individuals like the plaintiff hostage. Under even the most restrictive interpretation of the term, the defendant's actions in this matter are clearly "outrageous" and warrant the imposition of punitive damages.

The Court must now determine the appropriate amount of punitive damages to award against the Iranian Ministry of Information and Security. In determining the amount of punitive damages to award, courts should consider several factors, including: "[1] the character of the defendant's act, [2] the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause, and [3] the wealth of the defendant." Restatement (Second) Torts § 908.

With respect to the first factor—the character of the defendant's act—the Court has already detailed the heinous nature of the defendant's conduct in this case. The defendant provided material support and resources to Amal, Islamic Amal, and Hizbollah so that these organizations could carry out terrorist acts such as the kidnapping and torture of John Cronin. It provided these terrorists with the knowledge and the funding necessary to carry out such terrorist attacks. With respect to the second factor—the extent and nature of harm to the plaintiff—the severity of the beatings that Cronin endured, as well as the added pain and suffering he sustained as a result of the bowel obstruction, were extreme. With respect

to the third factor—the wealth of the defendant—the Court finds that the Iranian Ministry of Information and Security has substantial amounts of funds at its disposal. As the Court noted in *Weinstein*, "the Iranian Ministry of Information and Security has approximately 30,000 employees and is the largest intelligence agency in the Middle East. Moreover, its annual budget is estimated to be between $100–$400 million." *Weinstein*, 184 F.Supp.2d at 25.

Based upon these factors, and consistent with punitive damage awards in similar cases brought under 28 U.S.C. § 1605(a)(7), the Court will award punitive damages in an amount equal to roughly three times the defendant's estimated annual budget for their support of terrorism. *Surette*, 231 F.Supp.2d 260 at 273–74 (awarding $300,000,000); *Stethem*, 201 F.Supp.2d at 92–93 (same). According to Dr. Clawson, the defendant spends approximately $100 million each year in support of organizations like Hizbollah to support its terrorist activities. Ex. 2. Based on this estimate, the Court will assess punitive damages against the MOIS in the amount of $300,000,000.

### III. CONCLUSION

The Court finds that the plaintiff has established his right to relief as required by 28 U.S.C. § 1608(e), and will therefore enter a judgment of default against Iran and the MOIS. The defendants are jointly and severally liable for $1,200,000 in compensatory damages, and the MOIS is liable for $300,000,000 in punitive damages.

A separate order shall issue this date.

### *JUDGMENT*

It is hereby ORDERED that judgment be entered in favor of the plaintiff, John R. Cronin, against the defendants, the Islamic Republic of Iran and the Iranian Ministry of Information and Security.

SO ORDERED.

### ORDER

Consistent with the Memorandum Opinion issued this date, it is hereby

ORDERED that judgment be entered in favor of the plaintiff, John R. Cronin, against the defendants, the Islamic Republic of Iran and the Iranian Ministry of Information and Security.

IT IS FURTHER ORDERED that the defendants are jointly and severally liable for compensatory damages in the amount of $1,200,000.

IT IS FURTHER ORDERED that the Iranian Ministry of Information and Security is liable for punitive damages in the amount of $300,000,000.

SO ORDERED.