Michael H. PRICE and Roger K. Frey, Plaintiffs,

v.

The SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA, Defendant.

No. CIV.A.97–975 RCL.

United States District Court, District of Columbia.

July 21, 2003.

Andrew C. Hall, Miami, FL, Nelson M. Jones, III, Nicholas & Jones, Houston, TX, James Cooper–Hill, Rockport, TX, for Plaintiffs.

Bruno Alexander Ristau, Law Offices of Bruno A. Ristau, PLLC, Arman Dabiri Abkenari, Washington, DC, for Defendant.

### MEMORANDUM AND ORDER

LAMBERTH, District Judge.

This matter comes before the Court on defendant's motion to dismiss [42–1] and plaintiffs' motion for summary judgment [43–1]. Upon consideration of the parties' motions, the opposition and reply briefs, and the applicable law in this case, the Court finds that defendant's motion to dismiss should be granted in part and denied in part, and that plaintiffs' motion for summary judgment should be denied.

### I. PROCEDURAL HISTORY

On May 7, 1997, plaintiffs commenced the present action, asserting claims arising under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602–1611 *et seq.* ("FSIA"), for hostage-taking and torture. Defendant filed a motion to dismiss, asserting that this Court lacked both subject matter jurisdiction and personal jurisdiction, and that plaintiffs had failed to state a claim on which relief could be granted. On August 24, 2000, this Court denied defendant's motion. *Price v. Socialist People's Libyan Arab Jamahiriya,* 110 F.Supp.2d 10 (D.D.C.2000) ("*Price I*"). Defendant appealed this Court's decision to the D.C. Circuit.

On June 28, 2002, the D.C. Circuit issued its opinion. *Price v. Socialist People's Libyan Arab Jamahiriya,* 294 F.3d 82 (D.C.Cir.2002) ("*Price II*"). The opinion included four principal rulings. First, the D.C. Circuit noted that because the issue of whether plaintiffs had stated a valid cause of action under the FSIA against a foreign state had neither been raised in this Court nor briefed on appeal, it would make no decision as to that issue. *Id.* at 87. Second, it concluded that plaintiffs' complaint had failed to state a proper claim for torture under the FSIA, and remanded to this Court to permit plaintiffs to amend their complaint to satisfy this defect. *Id.* at 94. Third, it dismissed plaintiffs' hostage-taking claim, explaining that "[u]nder no reasonable reading of the plaintiffs' complaint does their admittedly unpleasant imprisonment qualify as hostage taking so defined." *Id.* Fourth, it affirmed this Court's determination that it possessed personal jurisdiction over defendant. *Id.* at 99 ("[W]e hold that the Fifth Amendment poses no obstacle to the decision of the United States government to subject Libya to personal jurisdiction in the federal courts."). The D.C. Circuit remanded to this Court for proceedings consistent with its opinion. *Id.* at 100.

On April 10, 2003, this Court granted plaintiffs' motion to file an amended com-

plaint in the present action. Defendant filed a motion to dismiss the amended complaint on May 12. Plaintiffs filed their brief in opposition on June 5, and defendant filed its reply brief on June 11. On May 13, plaintiffs submitted a motion for summary judgment. Defendant filed its brief in response on May 15. The Court held a hearing on all pending motions on July 11, 2003, during which it heard oral arguments on defendant's motion to dismiss and plaintiffs' motion for summary judgment.

## II.  LEGAL ANALYSIS

### A.  Defendant's Motion to Dismiss

Defendant has moved to dismiss the present action on three separate grounds. Defendant first states that plaintiffs' cause of action based on hostage-taking may not be considered by this Court on remand in light of the D.C. Circuit's decision in *Price II*. Second, defendant alleges that plaintiffs' cause of action based on torture must be dismissed for lack of subject matter jurisdiction. Third, and in the alternative, defendant asserts that plaintiffs' torture claim must be dismissed for failure to state a claim on which relief may be granted. The Court will examine each point in turn.

### 1.  Hostage–Taking

As noted above, the D.C. Circuit reversed this Court's denial of defendant's motion to dismiss as to the hostage-taking claim asserted by plaintiffs. Its explanation of this reversal warrants quotation at some length:

> In this case, the complaint asserts only that Libya incarcerated Price and Frey "for the purpose of demonstrating Defendant's support of the government of Iran which held hostages in the U.S. Embassy in Tehran, Iran." Compl., at ¶ 7. Such motivation does not satisfy the ... intentionality requirement [of the

International Convention Against the Taking of Hostages, 28 U.S.C. § 1605(e)(2) ]. The definition speaks in terms of conditions of release; the defendant must have detained the victim in order to compel some particular result, specifically to force a third party either to perform an act otherwise unplanned or to abstain from one otherwise contemplated so as to ensure the freedom of the detainee. Accordingly, detention for the goal of expressing support for illegal behavior—even for behavior that would itself qualify as "hostage taking"—does not constitute the taking of hostages within the meaning of the FSIA.

> In this case, the plaintiffs have suggested no demand for quid pro quo terms between the government of Libya and a third party whereby Price and Frey would have been released upon the performance or non-performance of any action by that third party. Indeed, even when read most favorably to them, their complaint points to no nexus between what happened to them in Libya and any concrete concession that Libya may have hoped to extract from the outside world. The one purpose that plaintiffs have alleged is plainly inadequate, and they have advanced no others. Their allegation thus falls short of the standard for hostage taking under § 1605(a)(7).

> For these reasons, Libya cannot be stripped of its sovereign immunity based on plaintiffs' allegation of hostage taking. The District Court thus erred in refusing to dismiss this count. Accordingly, we reverse on this point.

*Price II*, 294 F.3d at 94–95.

█ However, plaintiffs' amended complaint includes a claim for hostage-taking under the FSIA. In its opposition brief to defendant's motion to dismiss, plaintiffs

assert that the D.C. Circuit remanded, rather than reversed, as to their hostage-taking claim, allowing plaintiffs on remand to amend their complaint to state a valid claim of hostage-taking. The sole support proffered for this interpretation of the D.C. Circuit's mandate consists of dicta in a later case, *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 235 (D.C.Cir.2003). It does appear that in *Simpson*, the D.C. Circuit mistakenly indicated that in *Price II*, it had vacated, not reversed, this Court's denial of defendant's dismissal motion as to the hostage-taking count. But the Circuit's faulty dicta in a later case does not trump the clear holding in the present case. It is manifest that in *Price II*, the D.C. Circuit dismissed plaintiffs' hostage-taking claim. The principle of res judicata thus mandates that this Court dismiss plaintiffs' amended complaint to the extent that it asserts claims against defendant based on hostage-taking.

### 2. Subject Matter Jurisdiction

In *Price II*, the D.C. Circuit explained that when a cause of action based on torture is brought against a foreign state pursuant to the 1996 amendments to FSIA, "it is especially important for the courts to ensure that foreign states are not stripped of their sovereign immunity unless they have been charged with actual torture, and not mere police brutality." *Price II*, 294 F.3d at 93. As noted above, it concluded that plaintiffs' complaint lacked the specificity necessary to establish a claim against defendant based on torture, and remanded to this Court to permit plaintiffs to amend their complaint. *Id.* at 94.

The D.C. Circuit noted that "[p]laintiffs must allege more than that they were abused. They must demonstrate in their pleadings that Libya's conduct rose to such a level of depravity and caused them such intense pain and suffering as to be properly classified as torture." *Id.* It observed that the FSIA's definition of "torture" was derived from the definition of that term in the Torture Victim Protection Act of 1991:

> any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

28 U.S.C. § 1350 (note). The D.C. Circuit provided an additional gloss on the terms "severe" and "for such purposes" in this definition. It explicated the word "severe" by noting that

> [t]he critical issue is the degree of pain and suffering that the alleged torturer intended to, and actually did, inflict upon the victim. The more intense, lasting, or heinous the agony, the more likely it is to be torture. *See* S. EXEC. REP. NO. 101–30, at 15 ("The United States understands that, in order to constitute torture, an act must be a deliberate and calculated act of an extremely cruel and inhuman nature, specifically intended to inflict excruciating and agonizing physical or mental pain or suffering.") (internal quotation marks omitted). This understanding thus makes clear that torture does not automatically result whenever individuals in official custody are subjected even to direct physical assault. Not *all* police brutality, not *every* instance of excessive force

used against prisoners, is torture under the FSIA.

*Price II*, 294 F.3d at 93 (emphasis in original). As for the "for such purposes" language, the D.C. Circuit explained that this phrase

> suggests that any non-enumerated purpose would have to be similar in nature to those mentioned in order to elevate an act of violence into an act of torture. Moreover, this requirement ensures that, whatever its specific goal, torture can occur under the FSIA only when the production of pain is purposive, and not merely haphazard. In order to lose its sovereign immunity, a foreign state must impose suffering cruelly and deliberately, rather than as the unforeseen or unavoidable incident of some legitimate end.

*Id.* (citation omitted).

Defendant has moved to dismiss plaintiffs' claims based on torture, asserting that it fails to satisfy these standards. Defendant does not claim that the amended complaint fails to allege a proper claim for torture under the FSIA, but rather contends that deposition testimony presented in an action brought by plaintiffs in the Southern District of New York ("the New York deposition testimony") contradicts the allegations presented in the amended complaint. Therefore, it has moved to dismiss the plaintiffs' torture claims pursuant to Federal Rule of Civil Procedure 12(b)(1), asserting that this Court lacks subject matter jurisdiction because an invalid torture claim brought under the FSIA does not waive Libya's sovereign immunity.

■ Generally speaking, when deciding a motion to dismiss, a district court must presume all factual allegations presented in a complaint to be true. *World Wide Minerals v. Republic of Kazakhstan*, 296 F.3d 1154, 1157 n. 2 (D.C.Cir.2002). As

explained by the D.C. Circuit in *Phoenix Consulting v. Republic of Angola*, 216 F.3d 36, 40 (D.C.Cir.2000), this standard applies equally in a FSIA case in which a defendant challenges the legal sufficiency of the jurisdictional allegations presented in the complaint. However, it continued,

> [i]n some cases, ... the motion to dismiss will present a dispute over the factual basis of the court's subject matter jurisdiction under the FSIA, that is, either contest a jurisdictional fact alleged by the plaintiff, or raise a mixed question of law and fact. When the defendant has thus challenged the factual basis of the court's jurisdiction, the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant. Instead, the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss. The district court retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction, but it must give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction. In order to avoid burdening a sovereign that proves to be immune from suit, however, jurisdictional discovery should be carefully controlled and limited; it should not be authorized at all if the defendant raises either a different jurisdictional or [another] non-merits ground such as forum non-conveniens or personal jurisdiction the resolution of which would impose a lesser burden upon the defendant.

*Id.* (internal citations and quotation marks omitted).

In the present case, defendant has challenged the factual basis of this Court's subject matter jurisdiction by calling into

question the facts in plaintiffs' amended complaint underlying their torture claims. Accordingly, the Court heard oral arguments on this issue from both parties during a hearing on July 11, 2003. During this hearing, plaintiffs' counsel asserted that, despite the apparently conflicting accounts of plaintiffs' treatment at the hands of defendant in the New York deposition testimony and plaintiffs' amended complaint, defendant had presented no evidence to contract plaintiffs' allegations of mental torture.

Indeed, paragraphs 28–31 of plaintiffs' complaint allege that on three separate occasions, plaintiffs were bound and forced to watch as another prisoner was beaten. Plaintiffs further allege that on each of these occasions, the head of the prison informed them that if they did not sign a confession that they were American spies, they would receive the same treatment that they were witnessing. Plaintiffs allege that on the first occasion, a Tunisian prisoner was beaten even after he lost consciousness, until he appeared to be dead. On the second occasion, plaintiffs allege, a Libyan journalist was beaten. Plaintiffs allege that they were informed that the journalist was being beaten because he had spoken to them and had afforded them some assistance in coping with their incarceration. On the third occasion, plaintiffs allege, a fellow prisoner was beaten to death with truncheons and a hammer. Plaintiffs allege that they were told that the prisoner was killed because he had shared food with plaintiffs that he had received from friends or relatives.

Additionally, plaintiffs allege that approximately one week before they were forced to witness these three beatings, they were visited in prison by a person claiming to be an attorney, who informed them that they would probably receive a lengthy prison sentence or the death penalty if they did not confess to being spies. Pls.' Am. Compl. ¶ 27. They further allege that approximately two days after the final beating that they were forced to witness, they were interrogated by three prosecutors, and told by the chief prosecutor that they were being afforded one final chance to sign confessions admitting they were spies. Plaintiffs allege that the chief prosecutor told them that if they did not sign the documents that they were presented, they would suffer the consequences that befell the three prisoners. Plaintiffs allege that the Libyan secretary of justice and secretary for foreign affairs were present during this interrogation. They allege that during this meeting, they signed documents written in Arabic without being provided an English translation. Pls.' Am. Compl. ¶ 33.

■ The Court concludes that these allegations, which do not conflict with the New York testimony, state a valid claim for mental torture. Plaintiffs were allegedly forced to watch on three separate occasions as fellow prisoners were beaten, one of whom was beaten to death. They were allegedly informed on each occasion that they would suffer the same fate if they refused to confess that they were guilty of espionage. Finally, they were allegedly informed, during an interrogation at which cabinet-level Libyan officials were present, that they were being afforded one last chance to confess, or they would be beaten as they had seen their fellow prisoners be beaten. These allegations satisfy the high standards required by the FSIA for setting forth a claim for mental torture. As for the conflicting versions of the physical treatment to which plaintiffs were subjected, the Court concludes that these allegations would be more properly dealt with during a trial on the merits than in a dismissal motion. Accordingly, defen-

dant's motion to dismiss for lack of subject matter jurisdiction will be denied.

### 3. Failure to State a Claim on Which Relief May Be Granted

In *Price II*, the D.C. Circuit asserted that "our decision today does not address or decide whether the plaintiffs have stated a *cause of action* against Libya," noting that "[t]here is a question . . . whether the FSIA creates a federal cause of action for torture and hostage taking *against foreign states*." *Price II*, 294 F.3d at 87 (emphasis in original) (citing *Roeder v. Islamic Republic of Iran*, 195 F.Supp.2d 140, 171–73 (D.D.C.2002)). Having flagged the issue, the D.C. Circuit "[left] its disposition to the District Court in the first instance following remand of this case." *Id.* This issue is now squarely before this Court because defendant has moved to dismiss the present action for failure to state a claim on which relief may be granted, asserting that the FSIA, as amended, does not provide a cause of action against foreign states.

In order to address this question, it will be necessary to provide a brief synopsis of the recent amendments to the FSIA.[1] Prior to the twentieth century, as a matter of common law, foreign nations were absolutely immune from suit in the federal courts. *See, e.g., The Schooner Exchange v. M'Faddon*, 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812); *Berizzi Bros. Co. v. Pesaro*, 271 U.S. 562, 46 S.Ct. 611, 70 L.Ed. 1088 (1926). However, with the growth of international trade and shipping, the United States began to recognize the restrictive theory of foreign sovereign immunity, which allowed suits that arose from a foreign nation's commercial dealings. *See* S. SUCHARITKUL, STATE IMMUNITIES AND TRADING ACTIVITIES IN INTERNATIONAL LAW (1959);

Friedmann, *Changing Social Arrangements in State–Trading States and Their Effect on International Law*, 24 LAW & CONTEMP. PROBS. 350 (1959). The passage of the FSIA in 1976 codified this theory. It provided that suits against foreign nations were barred by sovereign immunity unless they fell within one or more of a series of enumerated exceptions, all involving commercial dealings with the United States.

By the 1990s, however, Congress had grown increasingly frustrated with the federal courts for having dismissed a number of actions, on subject matter jurisdiction grounds, that had been brought by American victims of abuse by foreign nations. In 1996, Congress addressed this problem by including within the Antiterrorism and Effective Death Penalty Act, 110 Stat. 1214 ("AEDPA"), an amendment to the FSIA revoking the foreign sovereign immunity of nations which sponsored terrorist acts. This amendment ("the state-sponsored terrorism exception") created a new exception under the FSIA for any foreign nation designated by the State Department as a sponsor of terrorism, if that nation either commits a terrorist act resulting in the death or personal injury of a U.S. national, or provides material support and resources to an individual or entity that commits such a terrorist act. 28 U.S.C. 1605(a)(7).

Realizing that the new exception did not unambiguously explain the potential causes of action for which sovereign immunity had been waived, Congress acted swiftly to clarify the issue. On September 30, 1996, it passed an amendment to 28 U.S.C. 1605(a)(7), providing, in relevant part:

> An official, employee, or agent of a foreign state designated as a state sponsor

---

1. A fuller discussion may be found in *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 11–13, from which the present synopsis has been drawn.

of terrorism designated under section 6(j) of the Export Administration Act of 1979 while acting within the scope of his or her office, employment, or agency shall be liable to a United States national or the national's legal representative for personal injury or death caused by acts of that official, employee, or agent for which the courts of the United States may maintain jurisdiction under section 1605(a)(7) of title 28, United States Code for money damages which may include economic damages, solatium, pain, and suffering, and punitive damages if the acts were among those described in section 1605(a)(7). . . . No action shall be maintained under this action [sic] if an official, employee, or agent of the United States, while acting within the scope of his or her office, employment, or agency would not be liable for such acts if carried out within the United States.

Civil Liability for Acts of State Sponsored Terrorism, Pub.L. 104–208, Div. A, Title I, § 101(c), 110 Stat. 3009–172 (codified at 28 U.S.C.A. § 1605 note). This provision of law is commonly referred to as the "Flatow Amendment." Because the Flatow Amendment is hardly a model of clear legislative drafting, it has proven necessary for the courts to explain the manner in which it should be construed.[2] For example, the first case in this Circuit to construe the Flatow Amendment held that it is to be construed *in pari materia* with the state-sponsored terrorism exception to the FSIA. *See Flatow*, 999 F.Supp. at 13 ("The amendment should be considered to relate back to the enactment of 28 U.S.C. § 1605(a)(7) as if they had been enacted as one provision . . . and the two provisions should be construed together and in refer-

ence to one another.") (internal citation omitted).

More pertinent to the present inquiry, this Court has consistently interpreted the Flatow Amendment to provide a cause of action against foreign states for any act that would provide a court with jurisdiction under 28 U.S.C. § 1605(a)(7). *See, e.g., Kerr v. Islamic Republic of Iran*, 245 F.Supp.2d 59, 63 n. 9 (D.D.C.2003) (Jackson, J.) (finding that construction of the Flatow Amendment to afford victims of state-sponsored terrorism a cause of action against foreign states "is in keeping with this Court's understanding of the Flatow Amendment and comports with its own earlier decisions finding sovereign states liable for state-sponsored terrorism"); *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 106 (D.D.C.2000) (Joyce Green, J.) ("The [Flatow Amendment] provides a cause of action against a foreign state and its agents for any act which would give a court jurisdiction under 28 U.S.C. § 1605(a)(7)."); *Wagner v. Islamic Republic of Iran*, 172 F.Supp.2d 128, 133 (D.D.C.2001) (Jackson, J.) ("In the amendments to FSIA enacted by the Antiterrorism and Effective Death Penalty Act of 1996, Congress empowered private litigants to sue foreign states that sponsor terrorism for certain acts that result in personal injury or death if either the claimant or a victim was a citizen of the United States at the time."); *Cicippio v. Islamic Republic of Iran*, 18 F.Supp.2d 62, 67 (D.D.C.1998) (Jackson, J.) ("Enacted as an amendment to the FSIA in 1996, § 1605(a)(7) enables U.S. courts to entertain cases brought directly against a sovereign foreign state, once it has been formal-

**2.** The only legislative history of the Flatow Amendment which this Court has located consists of two sentences in the House conference report: "The conference agreement inserts language expanding the scope of monetary damage awards available to American victims of international terrorism. The conferees intend that this section shall apply to cases pending upon enactment of this Act." H.R. CONF. REP. 104–863, at 985 (1996).

ly designated by the U.S. Department of State as a state sponsor of terrorism, that either commits a terrorist act (including 'hostage taking' and 'torture') on its own, or provides material support to the perpetrators of such an act, which results in the death of or injury to an American citizen.").

Defendant cites, as an apparent exception to this line of cases, *Roeder v. Islamic Republic of Iran*, 195 F.Supp.2d 140 (D.D.C.2002) (Sullivan, J.). However, the *Roeder* court did not conclude that the Flatow Amendment had failed to provide a cause of action against foreign states. Instead, it merely held that the amendment was facially ambiguous on the issue, and it did so in order to avoid reaching a number of difficult constitutional questions. It will be necessary to analyze the *Roeder* opinion at some length in order to demonstrate the limited scope of its holding.

The plaintiffs in *Roeder* were American nationals who had been kidnapped by the government of Iran during the hostage crisis of 1979–81. In order to secure their release, the United States entered into an international executive agreement with Iran on January 19, 1981, which is known as the "Algiers Accords." One of the provisions of the Algiers Accords barred U.S. courts from adjudicating any claims asserted by the hostages arising from their captivity in Iran. President Carter issued a

series of executive orders implementing the Algiers Accords, which were later ratified by President Reagan. *Roeder*, 195 F.Supp.2d at 146–48.

Despite the ratification of the Algiers Accords, the former hostages filed suit against Iran on December 29, 2000, asserting claims under the FSIA. Judge Sullivan entered a default judgment against the defendants, and scheduled a trial to determine the amount of damages. On the eve of trial, the United States filed an emergency motion to intervene, asserting that the Algiers Accords mandated a vacation of the default judgment, and a motion to dismiss, asserting a lack of subject matter jurisdiction. *Id.* at 150–51. While the motion was still pending before Judge Sullivan, Congress introduced into an appropriations act a provision purporting to amend the FSIA to bestow this Court with subject matter jurisdiction over the *Roeder* plaintiffs' claims.[3]

Judge Sullivan granted the United States's motion to intervene, and vacated the default judgment on statutory grounds. *Id.* at 154, 158–59. He then noted the serious constitutional problems raised by the passage of the congressional provision: first, that "by expressly directing legislation at pending litigation, Congress has arguably attempted to determine the outcome of this litigation," and second, that "by legislating no more broadly than is-

---

**3.** *See* Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 2002, 115 Stat. 748 (2001) ("Amend 28 U.S.C. Section 1605(a)(7)(A) by inserting at the end, before the semicolon, the following: 'or the act is related to Case Number 1:00CV03110(ESG) [sic] in the United States District Court for the District of Columbia.' "). A month later, Congress included in another appropriations act a technical amendment to the first provision. *See* Department of Defense and Emergency Supplemental Appropriations Act, 115 Stat. 2230 (2001). Although this second provision con-

stituted only a technical amendment to the earlier provision, the conference committee report explained: "The [earlier provision] acknowledges that, notwithstanding any other authority, the American citizens who were taken hostage by the Islamic Republic of Iran in 1979 have a claim against Iran under the Antiterrorism Act of 1996 and the provision specifically allows the judgment to stand for purposes of award [sic] damages consistent with Section 2002 of the Victims of Terrorism Act of 2000 (Public Law 106–386, 114 Stat. 1541)." H.R. CONF. REP. 107–230 at 422–23.

sues presented by this litigation, Congress has also implicated Article III of the United States Constitution." *Id.* at 163, 164.

However, mindful of the cardinal principle of avoiding a determination of difficult constitutional questions where unnecessary, Judge Sullivan turned to the question of whether it would be necessary to resolve these issues. He determined that such a resolution would be unnecessary because the Algiers Accords required the dismissal of plaintiffs' claims. Specifically, he explained:

> When a court is presented with a statute and a previously-enacted international agreement that potentially cover the same legal ground, there are three possible relationships between the two: first, the statute can unambiguously fail to conflict with the agreement; second, the statutory language can be ambiguous, and one of its possible interpretations can conflict with the agreement; and third, the statute can unambiguously conflict with the agreement. . . . If a court is presented with the second situation, a conflict between one possible reading of an ambiguous statute and an earlier international agreement, that court must inquire into Congress' intent with respect to the abrogation of the international agreement prior to giving force to the statute. . . . Without a clear expression of Congressional intent to abrogate an agreement, a court must not read an ambiguous statute to so abrogate, and must interpret the statute so as to avoid the conflict. If and only if Congress' intent to abrogate is clear, may the court interpret the statute so as to conflict with and supercede the earlier agreement.

*Id.* at 169–70 (internal citations omitted). Judge Sullivan examined whether the FSIA, as amended, (1) unambiguously failed to conflict with the Algiers Accords,

(2) was facially ambiguous on the issue of whether it conflicted with the Algiers Accords, or (3) unambiguously conflicted with the Algiers Accords. Noting that "the Flatow Amendment does not on its face create a cause of action against foreign states," he concluded that the second situation applied:

> [T]he fact that an interpretation of these statutory provisions, when considered in the context of legislative intent and purpose, allowing plaintiffs to proceed against Iran is possible, does not end this Court's inquiry. Because these statutory provisions are at best ambiguous with respect to whether plaintiffs can sue Iran, if Congress has not expressed a sufficiently clear intent to abrogate the Algiers Accords, this Court *must* construe the statutes at issue to preclude such a suit.

*Id.* at 174–75 (emphasis in original). Having determined that Congress had failed to provide a clear expression that it intended to abrogate the Algiers Accords, Judge Sullivan declined to construe the FSIA, as amended, in such a way as to permit the *Roeder* litigation to proceed. *Id.* at 175–77. He therefore granted the United States's motion to dismiss, on the grounds that the Algiers Accords prevented the plaintiffs from proceeding with their cause of action.

Although the D.C. Circuit affirmed, it expressly declined to reach the issue of whether the FSIA provided a cause of action against state sponsors of terrorism. *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 n. 3 (D.C.Cir.2003). ("In view of the Flatow amendment's failure to mention the liability of foreign states, it is "far from clear" that a plaintiff has a substantive claim against a foreign state under the Foreign Sovereign Immunities Act. We have yet to decide the question and see no

reason to do so here.") (internal citations omitted).

The holding in *Roeder* is probably best understood as a decision to avoid confronting serious constitutional issues unnecessarily. Judge Sullivan stressed the limited scope of his holding, noting that he was only attempting to determine whether, *on its face*, the FSIA, as amended, unambiguously provided a cause of action against foreign states. *See Roeder*, 195 F.Supp.2d at 174 (defining the nature of the Court's inquiry as "whether the statute relied upon by plaintiffs is unambiguous on its face"). In fact, he expressly refrained from deciding the issue of whether, given the legislative history and purpose of the 1996 amendments to the FSIA, the statute should be interpreted as providing a cause of action against foreign states:

> [E]ven if this Court ultimately agrees with these courts that the purpose and history of this legislation could support reading into this statute a cause of action against a foreign government, these cases in no way support plaintiffs' claim that the language of these statutes *unambiguously* requires such a conclusion. Indeed, the previous opinions by this Court demonstrate Congress' lack of clarity and the lengths to which this Court had to go to interpret these provisions consistently.

*Id.* at 173 (emphasis in original). In this passage, as elsewhere, Judge Sullivan reiterated the fact that his sole inquiry was whether the statute was facially ambiguous on the subject of whether causes of action against foreign states were permitted. In fact, he concluded:

> The Court agrees that it is *possible* to read these statutory provisions, in the context of legislative history and intent, to provide for a cause of action against Iran. While all these pieces of legislation are less than the epitome of clarity, and

their enactment via appropriations rider leaves this Court with scant legislative history to consider, the history that does exist does indicate an intent to allow plaintiffs to proceed with their claims against Iran. This Court will not go so far as to conclude that the text of the Flatow Amendment and Subsection 626(c), separated from any legislative history or intent, unambiguously precludes the cause of action here.

*Id.* at 174 (emphasis in original).

In sum, the situation in *Roeder* trapped the Court between Scylla and Charybdis. On the one hand, other judges of this Court had previously determined, based on the legislative history and purpose of the 1996 amendments to the FSIA, that foreign states were liable for acts of state-sponsored terrorism. However, if Judge Sullivan were to find that these amendments, on their face, unambiguously permitted the *Roeder* plaintiffs' suit against Iran, he would have been forced to confront two grave separation-of-powers issues: (1) whether the 2001 congressional provisions providing for subject matter jurisdiction should trump an international agreement ratified by the executive branch, and (2) whether the provisions violated Article III by unduly interfering with the authority committed to the discretion of the judicial branch. Not wishing to "unnecessarily venture into the[se] murky waters," *id.* at 166, the Court decided that it should first address a preliminary inquiry: are the 1996 amendments to the FSIA facially ambiguous as to whether they allow a cause of action against foreign states? Upon deciding this question in the affirmative, Judge Sullivan declined to issue an unnecessary ruling on important constitutional issues.

In so doing, the *Roeder* court did not contradict the previous decisions in this Circuit, cited above, that the 1996 amend-

ments to the FSIA permitted victims of state-sponsored terrorist acts a cause of action against foreign states. In *Cronin v. Islamic Republic of Iran*, 238 F.Supp.2d 222 (D.D.C.2002), this Court presented four reasons why it had reached this conclusion. First, it noted that, read in conjunction with the text of 28 U.S.C. § 1605(a)(7), the text of the Flatow Amendment suggests that such a cause of action is proper. Specifically,

> under 28 U.S.C. § 1605(a)(7), the sovereign immunity of a foreign state will be abrogated if its "official, employee, or agent" provides material resources to the entity that commits the terrorist act. The Flatow Amendment likewise provides that an "official, employee, or agent" of a foreign state shall be liable if their actions were taken "while acting within the scope of his or her office, employment, or agency[.]" 28 U.S.C. § 1605(a)(7) note. In light of the identical language used in both statutory provisions, the Court finds that the respondeat superior implications of section 1605(a)(7) are equally applicable to the Flatow Amendment.... Moreover, by referring to officials, employees, and agents of foreign states, the Flatow Amendment makes clear that they can, in addition to the foreign state itself, be held liable for providing material support to groups that perform terrorist acts.... It also shows that to interpret the text of the Flatow Amendment as denying a cause of action against the foreign state itself would turn the scheme of § 1605(a)(7) on its head. Instead of using the acts of officials, employees, and agents to support liability against the foreign state, the same language would be used in the Flatow Amendment to deny victims of state-sponsored terrorism a cause of action against the responsible foreign state.

*Cronin*, 238 F.Supp.2d at 231 (internal citation omitted). Second, it noted, the legislative history of both the state-sponsored terrorism exception and the Flatow Amendment support the conclusion that causes of action against foreign states are appropriate, and the purpose of both amendments would be thwarted if such a cause of action were not permitted. *Id.* at 232. Third, later-enacted statutory provisions also support this conclusion. The Victims of Trafficking and Violence Protection Act of 2000, 114 Stat. 1464 (2000), authorizes FSIA plaintiffs who have received damages awards against foreign states to satisfy their judgments, utilizing frozen foreign assets held by the Treasury Department. The legislative history of this act indicates that Congress assumed that the 1996 amendments to the FSIA provided a cause of action against foreign states for supporting terrorist acts. *See Cronin*, 238 F.Supp.2d at 232–33 (citing two excerpts from the legislative history). Additionally, the 1998 amendment to 28 U.S.C. § 1606 (which was later repealed) permitted victims of state-sponsored terrorism to recover punitive damages against foreign states. 112 Stat. 2681–491 (1998). Fourth, and finally, with the single exception of the *Roeder* case, virtually every district judge in this Circuit who has addressed the issue has concluded that victims of state-sponsored terrorism have a cause of action against foreign states under the FSIA. *See Cronin*, 238 F.Supp.2d at 233 (citing cases).

This Court now adds two additional reasons. First, with the exception of *Roeder*, the United States has not intervened in FSIA actions against foreign states and attempted to dismiss them on the grounds that the FSIA does not provide a cause of action against foreign states. Nor has the United States filed a statement of interest to that effect in any pending action, even though it is authorized by statute to do so.

*See* 28 U.S.C. § 517 ("The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."). Second, the only other Court to have reached this issue has also concluded that the Flatow Amendment provides a cause of action against foreign states. *See Smith v. Islamic Emirate of Afghanistan,* 262 F.Supp.2d 217 (S.D.N.Y.2003). ("However, enactments subsequent to the Flatow Amendment, in particular the Victims of Trafficking and Violence Protection Act of 2000, imply that it does reach foreign states. While not free from doubt, the better view in my opinion is that the Flatow Amendment likely provides a cause of action against a foreign state.").

█ Given the great weight of authority supporting the proposition that the FSIA, as amended, affords victims of state-sponsored acts of terrorism a cause of action against the foreign states that sponsored such acts, and the limited scope of Judge Sullivan's holding in *Roeder,* this Court reaffirms the holding in *Cronin* that the FSIA does provide for such a cause of action. Accordingly, defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) will be denied.

**B. Plaintiffs' Motion for Summary Judgment**

█ Plaintiffs have moved for summary judgment in this action. However, as noted above, a number of material facts in this case are highly contested, the most pertinent being the facts presented in plaintiffs' amended complaint that underlie their torture claims. Because plaintiffs have not demonstrated that all material facts in this case are undisputed, the Court must deny their motion for summary judgment.

## III. CONCLUSION

For the reasons herein stated, it is hereby

ORDERED that defendant's motion to dismiss [42–1] be GRANTED in part and DENIED in part. It is further

ORDERED that defendant's motion to dismiss be, and hereby is, GRANTED as to each of plaintiffs' claims for hostage-taking under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(7). It is further

ORDERED that defendant's motion to dismiss be, and hereby is, DENIED as to defendants' motion to dismiss the present action pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction. It is further

ORDERED that defendant's motion to dismiss be, and hereby is, DENIED as to defendants' motion to dismiss the present action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim on which relief can be granted. It is further

ORDERED that plaintiffs' motion for summary judgment [43–1] be, and hereby is, DENIED.

´ SO ORDERED.