**Frank A. REGIER, et al., Plaintiffs,**

v.

**THE ISLAMIC REPUBLIC OF IRAN, et al., Defendants.**

**No. CIV.A.01–1302 (JDB).**

United States District Court,
District of Columbia.

Sept. 8, 2003.

Michael L. Martinez, Stuart Henry Newberger, Adam Gajadharsingh, Crowell & Moring LLP, Washington, DC, for plaintiffs.

## MEMORANDUM OPINION

BATES, District Judge.

This action against the Islamic Republic of Iran ("Iran") and the Iranian Ministry of Information and Security ("MOIS") arises out of the kidnapping of plaintiff Frank A. Reiger in Beirut, Lebanon, in 1984. Frank Regier was abducted near the campus of the American University of Beirut ("AUB") and was subsequently held for sixty-five days by members of the Iranian-sponsored terrorist organization, Hizbollah. Frank and his wife Mary Regier now seek compensatory and punitive damages under the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1602–1611, which eliminates foreign governments' immunity from suit for claims based on acts of state-sponsored terrorism, *id.* § 1605(a)(7).

Defendants failed to enter an appearance in this matter after being properly served with process. *See id.* § 1608. However, under the FSIA, even in such circumstances plaintiffs are required to "establish [their] claim or right to relief by

evidence satisfactory to the court." *Id.* § 1608(e). Accordingly, following proper notice to defendants through diplomatic channels, this Court held an evidentiary hearing on plaintiffs' claims on November 12–13, 2002. Defendants failed to appear.

Based on the evidence presented, the Court now enters judgment in favor of plaintiffs and makes the following findings of fact and legal and remedial conclusions.

## FINDINGS OF FACT

### I. Frank and Mary Regier

Frank Regier was born in the United States in Montgomery, West Virginia, on March 11, 1928. Tr. Vol. I, 75:6–75:11.[1] He is a citizen of the United States. Tr. Vol. I, 75:12–75:13. Frank graduated from high school in West Liberty, West Virginia. Tr. Vol. I, 75:14–75:17. Subsequently, he attended West Liberty State College for a year and a half, and Bethel College in North Newton, Kansas, for two additional years. Tr. Vol. I, 75:10–75:20. At Bethel, he received a B.A. degree in Mathematics. *Id.* For a semester, he was a graduate student in mathematics at Iowa State University. Tr. Vol. I, 75:21–75:22.

After a two-year tour of duty in the Army during the Korean War, Frank attended the University of California, Berkeley from 1953–57, where he received a B.S. degree in Electrical Engineering in 1955 and a M.S. degree in Electrical Engineering in 1957. Tr. Vol. I, 75:22–76:6.

Frank met Mary Regier in Berkeley in 1953. Tr. Vol. I, 76:17–77:5. From her he learned of the new engineering school being planned for AUB in Beirut. Tr. Vol. I, 77:13–77:16. Frank applied for and received a position on the faculty there upon his graduation from the University of California. Tr. Vol. I, 77:16–77:17. He joined the AUB faculty in 1957. *Id.* Subsequently, while on leave from AUB in 1964–68, Frank studied at Yale University, receiving a Ph.D. in Electrical Engineering in 1968. Tr. Vol. I, 76:6–76:13, 79:9–79:21.

Mary was born in Beirut on July 10, 1926. Tr. Vol. II, 20:20–20:23. She became a naturalized United States citizen in the summer of 1966 while on sabbatical at Yale. Tr. Vol. II, 20:24–21:13. Mary received both a B.A. and an M.A. in Mathematics from AUB. Tr. Vol. II, 21:14–21:17. Later, following one semester at Columbia University, Mary moved to Berkeley, California, and attended the University of California from 1953–57. Tr. Vol. II, 21:18–21:19. She received a Ph.D. in Statistics from the University of California in 1957. Tr. Vol. II, 21:19–21:21. Mary then returned to Beirut, where much of her family still lived, and accepted a position as an Assistant Professor on the AUB faculty. Tr. Vol. II, 21:25–22:6.

Frank and Mary were married in June 1958. Tr. Vol. I, 78:10–78:17. In the ensuing years they had two sons, Terrence P. Regier and Christopher G. Regier. Tr. Vol. I, 78:18–78:20.[2] Except for periods of sabbatical or studying, Frank and Mary served continuously on the faculty of AUB from 1957 until the events of the mid–1980s that form the basis of this case. Tr. Vol. I, 79:3–80:7; Tr. Vol. II, 22:5–22:10. By 1984, Frank had become Chairman of AUB's Electrical Engineering Department. Tr. Vol. I, 80:1–80:5.

---

1. "Tr. Vol. I" refers to the transcript of the bench trial in this case on November 12, 2002. "Tr. Vol. II" refers to the transcript of day two of the bench trial on November 13, 2002. "Exh." refers to those exhibits admitted into evidence during the bench trial.

2. Although they originally joined their parents as plaintiffs in this case, Terrence and Christopher subsequently withdrew.

## II. The Deteriorating Situation in Beirut

Although many of the years the Regiers resided in Beirut were peaceful and happy, in 1975, Lebanon was plunged into a long civil war. Tr. Vol. I, 80:8–80:19.[3] Then, in 1982, amidst the existing turmoil, Israel invaded southern Lebanon. Tr. Vol. I, 81:12–82:3.

The radical Islamic government in Iran saw in the Israeli invasion an opportunity to exert its influence in Lebanon and drive all Westerners, particularly the Americans and French, from Lebanon. *See* Tr. Vol. I, 11:24–17:15; Exhs. 6, 16, 18, 19. In support of this goal, Iran poured money and personnel into southern Lebanon to empower and train the Shiite Muslims of southern Lebanon—the sector of Lebanese society that traditionally had been at the low end of the economic scale. *See* Tr. Vol. I, 15:13–17:15; 48:20–54:7. Among other things, Iran established its influence by funding a terrorist group that went by various names including "Hizbollah" and "Islamic Jihad." *See* Tr. Vol. I, 15:13–18:11; 48:20–54:7; Exhs. 7, 9.

Beginning in the early 1980s, Hizbollah undertook a series of violent actions directed at Westerners. *See* Tr. Vol. I, 18:13–22:19, 51:16–20; Exhs. 8, 15, 19. In July 1982, David Dodge, then the Acting President of AUB, was kidnapped while walking across the AUB campus in Beirut, and was ultimately held hostage for one year. Tr. Vol. I, 20:1–20:5; Vol. I, 82:4–82:18. On April 18, 1983, the United States Embassy in Beirut was bombed, Tr. Vol. I, 82:19–83:1, and six months later, the United States Marine Barracks and a French military facility in Beiruit were both bombed, Tr. Vol. I, 83:2–83:8.

Through much of 1983, the AUB campus was generally an enclave from the fighting of the war. The Regiers lived on campus, and for a time, managed to be somewhat insulated from the chaos around them. Tr. Vol. I, 83:9–84:22. However, the relative calm on the AUB campus changed on January 18, 1984, when Malcolm Kerr, President of AUB since July 1982, was assassinated just outside of his office. Tr. Vol. I, 86:9–87:2.

## III. Frank's Abduction

The worsening conditions in Lebanon shook and worried the Regiers. They thought about leaving but did not immediately take any steps toward doing so. Tr. Vol. I, 83:9–83:14.

On February 10, 1984, within a month after President Kerr's assassination, Frank, then 55 years old, was kidnapped and taken hostage in Beirut. Tr. Vol. I, 87:11–87:13, 90:21–91:5.[4] Frank was ab-

---

**3.** In making its factual findings concerning the emergence of Hizbollah and the role of Iran and MOIS in that emergence, and, ultimately, in making its findings concerning the liability of Iran and MOIS for Frank Regier's abduction, the Court relies on the testimony provided by Dr. Patrick Clawson, Deputy Director of the Washington Institute for Near East Policy and an expert on Iran's politics, economics, and sponsorship of terrorism, and the testimony of Ambassador Robert Oakley, the U.S. State Department's coordinator for counterterrorism between 1984 and 1986. The Court also relies on documentary evidence, including declassified intelligence materials from the CIA and other agencies (*e.g.,*

Exhs. 7–18) and official State Department publications such as *Patterns of Global Terrorism: 1984* (Exh. 21).

**4.** It remains unclear why Frank was selected to be kidnapped. Tr. Vol. II, 35:25–36:8. One of the kidnappers told Frank that he had been hired to abduct "an American from AUB." Tr. Vol. I, 95:22–96:1. When Frank would ask his guards why, they replied either "I don't know" or "it's none of your business." Tr. Vol. I, 93:18–93:24; Exh. 33; *see also* Exhs. 25, 26, 29. Mary testified that the prior kidnapping of David Dodge "was something different" from Frank's abduction, "because, after all, he was a president of a

ducted at gunpoint off a Beirut street, forced into an automobile, and blindfolded. Tr. Vol. I, 89:1–91:12. The kidnappers drove Frank to an area of the city unfamiliar to him, where they tied his hands and feet and moved him to the trunk of their car. Tr. Vol. I, 91:14–91:18. Frank was taken first to the home of one of his abductors, where his hands were bound more securely, behind his back, and where he remained blindfolded. Tr. Vol. I, 92:3–92:7. His captors instructed him to lie down on a couch and not to move. Tr. Vol. I, 92:7–92:8. Frank could not help but move, however, as this position was extremely uncomfortable, and his guard would punch him in the face whenever he would do so. Tr. Vol. I, 92:8–92:23. Although the punches broke no bones, they caused Frank to "[see] stars," and his nose to swell so much that it became difficult for him to breathe. Tr. Vol. I, 92:14–92:17, 94:19–94:23.

That evening, Frank's kidnappers bound him in duct tape from head to toe, "like a mummy," although they left his mouth exposed, noticing his breathing troubles from the prior beatings. Tr. Vol. I, 92:25–93:1, 94:4–94:23, 97:4–97:7. Frank was then stuffed into a box (apparently designed to hold someone smaller than he) and hoisted into the false bottom of a truck. Tr. Vol. I, 94:24–95:6.

Frank's captors drove the truck for about ten minutes before reaching some

sort of checkpoint. Tr. Vol. I, 95:9–95:14. When the truck stopped and Frank heard a conversation taking place, he yelled for help. Tr. Vol. I, 95:15–95:18. Frank hoped that the personnel at the checkpoint would come to his aid, but instead people came running back, yanked Frank out of the box, and threw him on a pile of gravel. Tr. Vol. I, 95:18–95:21. Frank's captors became very angry with him, warned Frank not to speak again, and administered a shot of something that made Frank "woozy" for the rest of the trip. Tr. Vol. I, 95:22–96:9; Exh. 33.

Frank's captors then took him to a building where he was confined to an underground room. Tr. Vol. I, 96:14–96:16. In that location, as well as other locations where he was subsequently held, the sanitary conditions he endured were very poor. He did not have free or immediate access to toilet facilities, and remained blindfolded even when he was permitted to use them. Tr. Vol. I, 98:21–99:24. Thus, he would limit the intake of liquids to avoid a need for the toilet. Tr. Vol. I, 99:6–99:7. Frank was allowed only one shower, after about three weeks, and shaved only once while a hostage. Tr. Vol. I, 98:21–99:2, 105:8–18.

Frank was fed a monotonous and inadequate diet, and during his sixty-five days of captivity, he lost over thirty pounds. Tr. Vol. I, 101:17–101:21, 104:24–105:7; *see*

---

university. He came from a family of millionaires." Tr. Vol. II, 36:2–36:6. In contrast, Frank was "rank and file." Tr. Vol. II, 36:7.

Within three years, more than ten additional Americans suffered a similar fate. Among those kidnapped and held hostage were William Buckley, the local Central Intelligence Agency chief, kidnapped on March 16, 1984 (and killed while captive); Reverend Benjamin Weir of the Episcopal Church, kidnapped on May 8, 1984; Peter Kilburn, an AUB librarian, kidnapped on December 4, 1984; Fa-

ther Lawrence Martin Jenco of the Catholic Church, kidnapped on January 8, 1985; Terry Anderson of the Associated Press, kidnapped on March 16, 1985; David Jacobsen of the AUB Medical School, kidnapped on May 28, 1985; Thomas M. Sutherland, an AUB Agriculture Dean, kidnapped on June 9, 1985; and Beirut University College professors Robert Polhill, Alann Steen, and Jesse Turner, kidnapped together on January 24, 1987. *See* Tr. Vol. I, 18:13–22:19, Exhs. 8, 15, 19, 20, 34.

*also* Tr. Vol. II, 9:8–9:20. According to Mary, Frank appeared "quite sick" upon his release. Tr. Vol. II, 31:9. Photographs submitted to the Court bear this out. *See* Exhs. 35, 40, 41.

By any measure, the conditions of Frank's captivity were brutal and inhumane. He was usually shackled to the wall and blindfolded. Tr. Vol. I, 100:3–101:25; 101:22–101:25. He received little or no exercise. Tr. Vol. I, 105:3–22. In fact, when he was ultimately released, he was so weak that "just walking fifty yards or something like that was quite exhausting." Tr. Vol. I, 105:20–105:22.

Frank was occasionally beaten by his captors and threatened with death if he did not act exactly as they demanded. Tr. Vol. I, 95:8–95:9, 115:17–115:25. On one occasion he was kicked in the face while he was sleeping. Tr. Vol. I, 107:1–107:5. As Frank testified, his captors were "frighteningly sadistic." Tr. Vol. I, 115:9–115:15; Exh. 32; *see also* Tr. Vol. I, 100:23–100:25, 101:6–101:7.

Indeed, Frank was both the victim of and the witness to certain psychological torture. Tr. Vol. I, 107:6–112:1. For example, he was once told that he was about to be released, only to be driven to what became the third location where he was kept. Tr. Vol. I, 107:10–108:17, 109:23–110:13. Understandably, this experience left him "very depressed." Tr. Vol. I, 110:22–111:2. On another occasion, Frank became loose from his chains in the middle of the night, but could not bring himself to attempt an escape. Tr. Vol. I, 101:25–102:18.

In a similar vein, although Frank's kidnappers provided him a supply of medication for the treatment of a heart condition, he testified that the medication was also valuable because he

> had there the means of committing suicide. I had no thought of committing suicide, but I also knew things could get much worse than they are; and it could happen that at some time in the future I'd want to do it.

Tr. Vol. I, 112:5–112:16. Frank wondered if he could "possibly endure" one year, the length of David Dodge's captivity, and testified that his sixty-five days "seemed like an eternity." Tr. Vol. I, 111:7–111:14. He "sometimes questioned whether [his] sanity would be intact" if he ever did get out. Exh. 26.

Frank testified to a "complete reversal from normal experience" with regard to sleeping and being awake. Tr. Vol. I, 106:18–106:21.

> I would sometimes have a happy dream, and then I would wake up to the nightmare rather than the other way around. The nightmare was waking up, not going to sleep.

Tr. Vol. I, 106:21–106:25.

Over sixty-five days, Frank was held in four different locations—all cramped and unpleasant—around Beirut, all basements or top floors so as to avoid the attention of passersby. Tr. Vol. I, 98:10–98:17. When his captors transported him from place to place, he was bound and, at least once, again put in the trunk of a car. Tr. Vol. I, 116:6–116:9.

Most of the time, Frank was held in isolation from any other person, with the exception of a French prisoner (Christian Joubert, also kidnapped by Hizbollah) who was sometimes held in the same room. Tr. Vol. I, 113:15–113:16; Exh. 25. Frank was sporadically provided reading material, although most of it was not in English, and he was not allowed any television or radio to pass the time. Tr. Vol. I, 103:3–104:23.

During the entire period of Frank's captivity, he was not permitted to contact his family in any fashion. Tr. Vol. I, 102:23–

102:25. Nor was his family able to get any word to him. Tr. Vol. I, 103:1–103:2. Frank's family made extensive efforts to learn more about his whereabouts and condition, but despite their extensive efforts, they learned nothing. Tr. Vol. II, 25:6–26:11.

Mary, also a tenured member of the AUB faculty at the time, testified to her extreme emotional distress while her husband was missing. She could not sleep and she shunned social situations. Tr. Vol. II, 26:17–24. She was unable to concentrate on her work. Tr. Vol. II, 26:23–24. On one occasion, the United States ambassador, Reginald Bartholomew, showed Mary a haunting photograph of Frank, believed to be sent by his captors, in which she thought Frank "looked like [he] had just seen a ghost," and that the kidnappers "had hurt him to such an extent that he lost his mind." Tr. Vol. I, 112:17–113:11; Tr. Vol. II, 28:6–29:6; see also Exh. 5. The photograph "looked like someone from a lunatic asylum" more than it looked like Frank. Tr. Vol. II, 28:19–28:21. To this day, this disturbing image still bothers Mary. Tr. Vol. II, 29:6–29:7.

## IV. Frank's Rescue and the Regiers' Return to the United States

Various news sources reported that, on April 11, 1984, some young boys were playing in a vacant lot next to an old, seemingly deserted house in West Beirut. The boys went up to a window in the house and peeked in through the glass and wrought iron bars. Inside, they saw two men—Regier and Joubert—sitting in chairs with their eyes blindfolded, and their arms and feet bound. The young boys ran to the nearby office of Amal (one of the political factions in Beirut) and told soldiers there what they had seen. Amal had been unsuccessfully searching for Frank and Joubert since their abduction.

Immediately, Amal put the house discovered by the boys under 24–hour surveillance. The security staffs of the American and French embassies were contacted for assistance. See Exh. 26, 27, 28, 29, 30, 31.

On Palm Sunday, April 15, 1984, Amal militiamen finally surrounded the house, burst in, and rescued Regier and Joubert. Tr. Vol. I, 117:11–117:13, 118:21–119:1, 119:6–119:21; see also Exhs. 25, 26. Although thrilled, this dramatic event frightened Frank, who reasonably figured he was either being rescued or about to be killed. Tr. Vol. I, 119:2–119:5; Exh. 33. The sound of gunfire scared Frank, putting his "heart ... up in [his] throat." Tr. Vol. I, 118:21–118:23.

Amal took Frank and Joubert to one of its offices south of Beirut, and from there to the home of Nabih Berri, the Amal leader. Tr. Vol. I, 119:22–120:23. Muslim friends from AUB met Frank at Berri's house, and the entourage departed for the United States embassy. Tr. Vol. II, 3:23–4:12, 30:1–30:4. Mary met them there. Tr. Vol. II, 4:13–4:17, 30:7–30:12.

Frank spent a night at home before he and Mary boarded the U.S.S. Nassau, a helicopter carrier located a few miles off the coast of Lebanon. Tr. Vol. II, 5:16–7:12. Frank was taken there for debriefing and medical observation, and he stayed three or four days. Id.; see also Tr. Vol. II, 7:25–8:9; Exhs. 36, 37, 38, 39.

Frank then returned to his home on the AUB campus for a few days, where the United States Embassy provided him with twenty-four hour armed guards. Tr. Vol. II, 7:13–7:17, 10:6–10:8, 11:1–11:8. After wrapping up some personal business at AUB, Frank and Mary were flown by helicopter to Cyprus, where they spent one week relaxing. Tr. Vol. II, 10:11–10:17.

Frank, quite understandably, did not wish to return to Beirut, viewing the kid-

napping as "God's way of telling [him] to get the hell out." Tr. Vol. II, 11:9–11:13. Yet, once Frank and Mary arrived in Cyprus, Frank was essentially abandoned by the United States government, left to return to the United States on his own. Tr. Vol. II, 10:13–10:21. When his plane arrived in New York, no government official met him, either at the airport or thereafter. *Id.*

Following his return, Frank felt that, unlike other hostages, he was largely disregarded by the media and by the American public. Tr. Vol. II, 15:15–16:5; Exh. 33. Even AUB appears to have been surprisingly unsympathetic to the Regiers' ordeal, offering them no special accommodations, and withholding from Mary a portion of the pension that she believed she was rightfully owed. Tr. Vol. II, 22:13–23:3, 32:19–33:8.

Prior to his abduction, Frank had applied for both a sabbatical position at Yale and a 10-week NASA Summer Faculty Fellowship at the NASA–Lewis Research Center in Cleveland, Ohio. Tr. Vol. II, 11:14–11:24. While he was being held hostage, Frank won both. Tr. Vol. II, 12:5–12:11, 12:23–12:24. Returning to the United States after his release, Frank made his way to Cleveland for the NASA program. Tr. Vol. II, 12:12–12:14. He spent the ensuing academic year at Yale, and then returned to Cleveland for a second summer with NASA. Tr. Vol. II, 13:6–13:10.

In 1985, Frank accepted a full-time position with NASA as an engineer, where he remained employed until retiring in 1994. Tr. Vol. II, 13:14–13:24.[5] As much as Frank enjoyed his time with NASA, he nevertheless earned less and received fewer benefits than he would have had he remained at AUB as a tenured professor and finished his career there. Tr. Vol. II, 13:24–14:7; *compare* Exh. 42 *with* Exh. 43; *see also* Exh. 46. This loss of income was a direct consequence of his kidnapping and being held hostage by Hizbollah. Tr. Vol. II, 16:22–16:25. It is but one way in which his abduction "turned [his] life upside down" and affected him for years afterwards. Tr. Vol. II, 19:14–19:15.

Frank's family also suffered extensively. Mary learned of Frank's abduction over the telephone, and was told there had been several witnesses, although none of them had attempted to stop it or tried to identify who the kidnappers were. Tr. Vol. II, 23:11–23:24. The news, of course, caused Mary great shock. Tr. Vol. II, 23:25–24:4. She had to inform her sons, both of whom were in the United States, unable to return to Beirut to provide support. Tr. Vol. II, 24:10–24:19.

After the first night of Frank's disappearance, Mary testified that

> the first thing I did was to go to the door of the apartment and open it expecting to see Frank's body all tied up and sitting there outside the door, which shows you that I guess I was quite irrational at that point.

Tr. Vol. II, 24:25–25:3. Her further worry about Frank caused her to suffer extensive depression, anxiety, and humiliation. Tr. Vol. II, 25:6–27:2, 27:18–27:24.

When Frank was rescued from captivity, Mary was naturally ecstatic. Tr. Vol. II, 31:14. In the short term, after Frank returned to the United States, Mary attempted to resume her academic duties at AUB. Tr. Vol. II, 32:15. She made several trips to the United States over the follow-

---

5. Frank technically remained on the AUB faculty until 1987, when the university called on him either to return to Lebanon or resign. Because the United States had imposed a ban on travel to Lebanon, both he and Mary were forced to submit their resignations at that time. Tr. Vol. II, 22:11–23:8.

ing year, but the uncertainty of her family's future was a chronic worry. Tr. Vol. II, 32:16–32:18. Moreover, the long periods of separation caused both Frank and Mary anguish and anxiety, especially given the uncertainty of their future. Tr. Vol. II, 33:9–33:16.

In 1985, Mary took leave without pay from AUB to spend time with Frank. Tr. Vol. II, 33:14–33:16. When she tried to find a job in Cleveland, she found that, despite her long academic career, she was unable to procure a position. Tr. Vol. II, 33:17–34:2. Adding insult to injury, her application for unemployment benefits was also denied. Tr. Vol. II, 33:18–33:20. Mary testified this was the first time in her life she was neither a student nor a faculty member, and that she found this unfamiliar situation "very difficult ... psychologically." Tr. Vol. II, 34:5–34:7.

Mary ultimately obtained an adjunct position at Case Western Reserve University. She taught two classes per semester for the following fifteen years. Tr. Vol. II, 34:15–34:25. But over her entire Case Western career her pay remained minimal, often less each term than her son had received for teaching prior to finishing his doctoral degree. Tr. Vol. II, 35:1–35:12; Exh. 46. As a direct consequence of her husband's abduction, Mary was unable to continue advancing her career as a productive and respected academic with the income, benefits, and prestige to which she had become accustomed at AUB. Tr. Vol. II, 35:13–35:15, 38:2–38:6; Exhs. 44, 46.

Mary testified that the Regier family can never put Frank's abduction and captivity behind them because of the deep and lasting impact the experience had on each of them. Tr. Vol. II, 37:21–38:7.

## V. Hizbollah and Its Iranian Support

Hizbollah, which means "Party of God," was established in Lebanon as a response to the Israeli invasion of southern Lebanon in June 1982. Tr. Vol. I, 11:10–15:25, 17:16–17:18. Inspired by the Iranian Revolution of 1979, Hizbollah was formed, funded, and trained by the government of the Islamic Republic of Iran. Tr. Vol. I, 15:18–17:25, 48:5–49:8; Exhs. 7, 11, 12. The Iranian government was eager to create a militant organization that would fight the Israeli presence and Western influence in Lebanon. Tr. Vol. I, 11:18–11:23, 48:5–49:23, 62:20–64:11; Exhs. 11, 16. The Iranian government viewed the Lebanese Shiite Muslim population as a ready vehicle for furthering Iran's political goals in Lebanon. Tr. Vol. I, 15:13–15:25, 48:5–49:23.

Iran and MOIS—an Iranian agency responsible for coordinating Iran's terrorist activities in Lebanon and elsewhere, Tr. Vol. I, 58:4–64:1—supported Hizbollah in a number of ways. For example, soldiers from the Revolutionary Guard unit of the Iranian military set up headquarters in the Bekaa Valley to create Hizbollah. Tr. Vol. I, 51:5–52:7, 58:23–59:7. The Iranian government also provided funds, military arms, training, and other supplies to Hizbollah, and issued propaganda to encourage Lebanese Shiites, who greatly admired Iran, to join the organization. Tr. Vol. I, 50:16–54:21. In addition, the Iranian government helped fund Hizbollah's charitable activities. Tr. Vol. I, 50:16–51:4, 53:8–54:2; Exhs. 11, 13. This created a network within which Hizbollah could solicit recruits and conduct its covert activities. Tr. Vol. I, 50:16–54:2.

Since its inception, Hizbollah has engaged in a variety of terrorist activities to spread its message throughout the world, including the kidnapping of foreign nationals from well-known institutions. Tr. Vol. I, 38:10–57:24; Exh. 34. Among many others, Hizbollah kidnapped a Catholic priest (Jenco), a Presbyterian minister (Weir), an Associated Press reporter

(Anderson), an official of the AUB Hospital (Jacobsen), and a Dean of Agriculture at AUB (Sutherland). *See* Exhs. 8, 15, 19, 20, 34. Hizbollah's goals in these and other kidnappings included securing the release of terrorists imprisoned in Kuwait, driving Westerners out of Lebanon, and publicizing its political causes. *Id.; see also* Tr. Vol. I, 55:2–64:11; Exhs. 7, 8, 11–14, 16–23.

On January 19, 1984, President Reagan designated Iran a state sponsor of terrorism, Exh. 3.[6] Indeed, during the early 1980s, Iran spent approximately $100 million or more per year on supporting terrorist activities. Tr. Vol. I, 52:20–53:7, 66:6–66:21. For instance, Iran and MOIS sponsored Hizbollah's activities with relation to: several kidnappings during this time period; the 1983 bombing of the United States Embassy in Beirut; the 1983 bombing of the Marine barracks in Beirut; and the January 18, 1984 assassination of Malcolm Kerr. *See* Tr. Vol. I, 15:10–16:23, 18:13–20:19; 48:20–54:7; *see also* Exhs. 5, 7, 8, 11–14, 16–23, 34.

As the evidence presented at the hearing made unmistakably clear, Hizbollah, funded by Iran and its MOIS, was similarly responsible for the kidnapping and forced captivity of Frank Regier. Tr. Vol. I, 20:20–37:9, 48:20–54:7, 54:22–57:24, 61:13–64:1; Exhs. 5, 15, 19, 20, 34. Ambassador Robert Oakley, who was the U.S. State Department's coordinator for counterterrorism between 1984 and 1986, testified that he had no doubt whatsoever that Iran and MOIS were directly involved in, supported, and were responsible for Mr. Regier's kidnapping. Tr. Vol. I, 35:14–35:25. He further stated that the White House, State Department, and CIA share this view. Tr. Vo. I, 36:1–36:9. Dr. Patrick Clawson, Deputy Director of the

Washington Institute for Near East Policy and an expert on Iran's politics, economics, and sponsorship of terrorism, likewise testified that there is "no question whatsover that Iran was extremely intimately involved" in Frank Regier's kidnapping. Tr. Vol. I, 61:23–61:24. As Dr. Clawson explained, although there is less evidence about Mr. Regier's kidnapping than the abductions of other persons in Beirut, "[i]t would be inconceivable that Iran was not involved" in Mr. Regier's case because it "fits so much into th[e] pattern" of kidnappings that Iran was known to have supported during the early 1980s. Tr. Vol. I, 63:15–63:20.

## *LEGAL AND REMEDIAL CONCLUSIONS*

### I. Jurisdiction

 Section 1605(a)(7) of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.*, eliminates sovereign immunity for a claim against a foreign state for personal injury "caused by an act of *torture*, extrajudicial killing, aircraft sabotage, *hostage taking*, or the provision of material support or resources ... for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605(a)(7) (emphasis supplied). Section 1605(a)(7) applies only where the foreign state was designated a state sponsor of terrorism at the time of the act or as a result of the act, the foreign state has been given a reasonable opportunity to arbitrate the claim if the act at issue occurred within the foreign state's territory, and either the claimant or the victim was a national of the United States at the time of

---

**6.** Iran has been designated as a state sponsor of terrorism ever since. *See* 22 C.F.R. § 126.1(d)(2002); 31 C.F.R. § 596.201 (2002).

the alleged act. *Id.* § 1605(a)(7)(A), (B)(i)-(ii).[7]

■ The requirements for applying Section 1605(a)(7) and eliminating Iran's sovereign immunity for the purposes of this suit are undoubtedly fulfilled here. As an initial matter, the more technical requirements of the Section are satisfied: Iran was designated a state sponsor of terrorism prior to Frank's abduction; the abduction did not take place within Iran's territory; and both Frank and Mary were United States citizens at the time of the events at issue.

Turning to the sufficiency of the acts alleged, the FSIA adopts the definitions of "hostage taking" and "torture" used in the International Convention Against the Taking of Hostages, and the Torture Victim Protection Act of 1991, respectively. 28 U.S.C. § 1605(e). Article I of the International Convention Against the Taking of Hostages defines a "hostage-taking" as follows:

> Any person who seizes ... or detains and threatens to kill, to injure or to continue to detain another person in order to compel a third party, namely, a State, an international governmental organization, a natural or judicial person or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offense of taking hostages within the meaning of the Convention.

34 U.N. GAOR Supp. No. 46, at 245 (TIAS 11081).

The Torture Victim Protection Act of 1991 defines "torture" as:

> [a]ny act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to lawful sanctions) whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

Torture Victim Protection Act of 1991, § 3(b)(1), 28 U.S.C. § 1350 Note. *See also Price,* 294 F.3d at 91–95.

The evidence is conclusive that Frank Regier was "tortured" and "taken hostage" as defined above, as Frank was kidnapped and imprisoned for 65 days under deplorable and inhumane conditions. Moreover, the evidence, in particular the testimony of Ambassador Robert Oakley and Dr. Patrick Clawson, leaves no doubt that agents of the Islamic Republic of Iran and MOIS were responsible for the abduction and confinement. It is worth noting in this regard that the Islamic Republic of Iran and MOIS have been found responsible for acts of torture and hostage-taking

---

7. Although Section 1605(a)(7) was enacted in 1996, as part of the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 1605(a)(7), the Section applies retroactively, and thus covers the events at issue from 1984. *See Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 13 (D.D.C.1998) (citing section 221(c) of Public Law 104–132: "The amendments made by this subtitle shall apply to any cause of action arising before, on or after the date of the enactment of this Act [April 24, 1996].").

It bears noting as well that the Court has both subject matter jurisdiction over this case under 28 U.S.C. § 1330(a) (Actions Against Foreign States) and personal jurisdiction over defendants under 28 U.S.C. § 1330(b). *See Price v. Socialist People's Libyan Arab Jamahiriya,* 294 F.3d 82, 95–100 (D.C.Cir.2002).

in a number of cases very similar to this one. *See, e.g., Cronin v. Islamic Republic of Iran,* 238 F.Supp.2d 222, 234 (D.D.C. 2002); *Surette v. Islamic Republic of Iran,* 231 F.Supp.2d 260, 267 (D.D.C.2002); *Jenco v. Islamic Republic of Iran,* 154 F.Supp.2d 27, 33 (D.D.C.2001); *Sutherland v. Islamic Republic of Iran,* 151 F.Supp.2d 27, 44 (D.D.C.2001); *Anderson v. Islamic Republic of Iran,* 90 F.Supp.2d 107, 113–114 (D.D.C.2000); *Cicippio v. Islamic Republic of Iran,* 18 F.Supp.2d 62, 68 (D.D.C.1998).

## II. Cause of Action

### A. Flatow Amendment

Having determined that defendants are not immune from suit, the Court must proceed to consider the substantive causes of action asserted. A principal question in this regard is whether Congress has provided a substantive cause of action against a state sponsor of terrorism. The Court of Appeals recently "flag[ged]" this issue but declined to decide it. *See Price,* 294 F.3d at 86–87; *see also Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 234 n. 3 (D.C.Cir.2003); *Bettis v. Islamic Republic of Iran,* 315 F.3d 325, 330 (D.C.Cir.2003).

■ By way of background, Section 1605(a)(7) of the FSIA initially was enacted as part of the comprehensive 1996 anti-terrorism legislation and was designed to remove sovereign immunity as a defense in cases against certain designated state sponsors of terrorism. The Flatow

Amendment, Pub.L. 104–208, div. A, title I, § 101(c) [title V, § 589], Sept. 30, 1996, 110 Stat. 3009–172, *codified in* 28 U.S.C. § 1605 note, adopted five months after § 1605(a)(7), provides a federal statutory cause of action for such cases. However, whereas § 1605(a)(7) waives the sovereign immunity of *foreign states* for certain terrorist acts and provides jurisdiction over claims that the employees or agents of such states engaged in terrorist activity while acting within the scope of their offices, the Flatow Amendment explicitly refers only to the *officials, employees, and agents* of those state sponsors of terrorism. The question thus arises as to whether the Flatow Amendment "creates a federal cause of action ... *against foreign states*" as opposed to just against their officials, employees, or agents. *See Price,* 294 F.3d at 87.

Judge Lamberth was the first judge to address this issue following *Price,* concluding that Congress had in fact created a cause of action against Iran and other culpable foreign state sponsors of terrorism under the FSIA even though the actual text of the Flatow Amendment does not explicitly so provide. *Cronin,* 238 F.Supp.2d at 231.[8] Judge Lamberth identified three reasons for this conclusion. First, the 1996 Amendments to the FSIA must be read in conjunction with the Flatow Amendment. The largely parallel language of the two provisions, both of which refer to officials, employees, or agents of a

---

**8.** Other judges of this Court have since followed Judge Lamberth's approach. *See, e.g., Kilburn v. Republic of Iran,* Civ. No. 01–1301, 2003 WL 21982239, at *11 (D.D.C. August 8, 2003) ("adopt[ing] the reasoning of Judge Lamberth in ... *Cronin* in reaching the conclusion that the Flatow Amendment does provide victims of state-sponsored acts of terrorism with a cause of action against the culpable foreign state"); *Acree v. Republic of Iraq,* Civ. No. 02–0632, 2003 WL 21537919, *36 (D.D.C. July 7, 2003) (citing *Cronin* for the proposition that "Section 1605(a)(7) ... creates a federal cause of action against officials, employees and agents of a foreign state, as well as the state and its agencies and instrumentalities themselves"); *Kerr v. Islamic Republic of Iran,* 245 F.Supp.2d 59, 63 n. 9 (D.D.C.2003) (the "construction of the Flatow Amendment [in *Cronin* ] is in keeping with this Court's understanding of the Flatow Amendment").

foreign state, Judge Lamberth held, indicates that Congress intended to create a cause of action against state sponsors of terrorism modeled on respondeat superior principles. *Id.* at 231–32. To hold otherwise, Judge Lamberth concluded, "would turn the scheme of § 1605(a)(7) on its head." *Id.* at 232.

Second, the legislative history of § 1605(a)(7) and the Flatow Amendment fully support the conclusion that Congress intended to create a cause of action against foreign state sponsors of terrorism.

The stated purpose[s] of the Antiterrorism Act [are] to "deter terrorist acts against U.S. nationals by foreign sovereigns or their agents and to provide for justice for victims of such terrorism." [*Elahi v. Islamic Republic of Iran,* 124 F.Supp.2d 97, 106 (D.D.C.200) ](citing 110 Stat. 1214 (1996)). *See also Flatow,* 999 F.Supp. at 12–13 ("The brief explanation of the Flatow Amendment's purpose in the House Conference Report explicitly states that it was intended to increase the measure of damages available in suits under 28 U.S.C. § 1605(a)(7).") (citing H.R. Conf. Rep. 863, 104th CONG, 1996). These stated intentions would both be thwarted by construing the Flatow Amendment in a manner that precludes victims of terrorism from bringing suit against the responsible foreign states. At the same time, the purposes of the legislation would clearly be advanced by victims having a cause of action against the responsible foreign state. Indeed, to construe the Flatow Amendment as not conferring a private cause of action against foreign states would mean that

what Congress gave with one hand in section 1605(a)(7) it immediately took away with the other in the Flatow Amendment.

*Id.* at 232.

Third, congressional enactments since section 1605(a)(7) and the Flatow Amendment make clear that Congress intended to create a cause of action against foreign states. For example, the Victims of Trafficking and Violence Protection Act of 2000, P.L. No. 106–386, 114 Stat. 1464 (2000) created a mechanism whereby, among other things, plaintiffs in several cases then pending against Iran or other foreign states for state sponsored acts of terrorism could obtain damages awards. *Cronin,* 238 F.Supp.2d at 232–33. As Judge Lamberth noted: "It is inconceivable that Congress would enable plaintiffs who obtained judgments against foreign states like Iran to recover the damage awards from the United States if the plaintiffs did not have a cause of action against the foreign state in the first place." *Id.* at 232.

This Court agrees with the analysis and conclusions of Judge Lamberth in *Cronin* and likewise holds that plaintiffs have a cause of action against Iran. Moreover, on the evidence presented, as discussed above, there is no doubt that plaintiffs have satisfied the substantive requirements for stating a claim under the Flatow Amendment, as Iran undeniably sponsored Hizbollah's acts of hostage-taking and torture in this matter.[9]

## B. Common Law

█ Even if the Flatow Amendment were held not to create a federal statutory

---

9. The Flatow Amendment contains the additional requirement that "an official, employee, or agent of the United States, while acting within the scope of his or her office, employment, or agency, would ... be liable for such acts if carried out within the United States."

28 U.S.C. § 1605 note. This requirement is satisfied here, as American officials would be liable for acts of hostage-taking or torture committed in the United States. *See Elahi,* 124 F.Supp.2d at 108 n. 14.

cause of action against state sponsors of terrorism, the Regiers would nevertheless have valid claims against Iran and MOIS under state and/or federal common law.[10] Courts have regularly concluded that common law claims for, *e.g.*, wrongful death, survival, assault, battery, false imprisonment, and kidnapping may be asserted against state sponsors of terrorism under the FSIA. *See Jenco*, 154 F.Supp.2d at 32–33; *Sutherland*, 151 F.Supp.2d at 47–50; *Elahi*, 124 F.Supp.2d at 109–13; *Flatow*, 999 F.Supp. at 27–32.

Here, the Regiers have alleged battery, assault, false imprisonment, intentional infliction of emotional distress, economic damages, and loss of consortium and solatium. The evidence adduced at the hearing clearly supports defendants' liability on these claims. *See* Restatement (Second) of Torts §§ 13 (battery), 21(1) (assault), 35 (false imprisonment), 46 (intentional infliction of emotional distress); *Daliberti v. Republic of Iraq*, 146 F.Supp.2d 19, 26 (D.D.C.2001) (awarding economic damages to former hostages for past and future lost wages); *Sutherland*, 151 F.Supp.2d at 51–52 (awarding damages to spouse of kidnapping victim for loss of consortium and solatium); *Anderson*, 90 F.Supp.2d at 113 (awarding damages to spouse of kidnapping victim for loss of consortium and solatium).

## III. Damages

### A. Frank Regier

■ Plaintiff Frank Regier seeks compensatory damages for the deplorable acts committed against him. In other cases, courts have generally awarded roughly $10,000 for each day of captivity for the intense suffering experienced by a hostage during captivity. *See, e.g., Anderson*, 90 F.Supp.2d at 113 ($10,000 for each day he was held hostage); *Sutherland*, 151 F.Supp.2d at 50 (same). Although, of course, no amount of money can compensate Frank Regier properly for the ordeal he experienced, the Court believes that an award of $10,000 per day is an appropriate amount in this case, and accordingly awards $650,000 in compensatory damages for Frank's suffering as a hostage in captivity.

Frank is also entitled to compensation for his lost wages as a result of his kidnapping and captivity. At the hearing this matter, the Court heard testimony from Dr. Bradley Schiller, an expert economist who testified that Frank's economic loss over time—the difference between the real income he enjoyed at AUB and the lower real income he received at NASA—is $1,662,944. *See* Exh. 46. The Court accepts Dr. Schiller's findings, as detailed in his report, and believes they represent a reasonable estimate of Frank's economic loss. *See Hill v. Republic of Iraq*, 328 F.3d 680, 683–685 (D.C.Cir.2003) (discussing standard for determining amount of economic damages under FSIA). Accordingly, the Court awards Frank Regier the total of $2,312,994 in compensatory damages.

### B. Mary Regier

■ Plaintiff Mary Regier seeks compensatory damages for her suffering as a

---

**10.** Plaintiffs also assert that, even if it does not provide a cause of action against Iran, the Flatow Amendment provides a cause of action against MOIS as an "official, employee, or agent" of Iran. As discussed with relation to punitive damages below, however, the D.C. Circuit's ruling in *Roeder*, 333 F.3d at 234–35, forecloses the argument that MOIS is an "agent" of Iran rather than the state of Iran itself for purposes of the Flatow Amendment. While theoretically the Flatow Amendment would allow recovery from an "official" or "employee" of Iran, plaintiffs have not in their Complaint named any "official" or "employee" of Iran or MOIS as a defendant in this matter; they have brought suit only against Iran and the entity MOIS.

result of Frank's abduction. The decisions of various judges of this Court have uniformly awarded compensatory damages to the spouse or spousal companion of a hostage plaintiff. As Judge Lamberth explained in *Sutherland*,

> when an organization takes someone hostage, it is implicitly intending to cause emotional distress among the members of that hostage's immediate family. Further, the Court finds that an organization taking someone hostage implicitly believes that such emotional distress is substantially certain to result.

151 F.Supp.2d at 52.

In some cases, courts have awarded spouses $10 million as compensation for their suffering during their husbands' kidnapping. *See, e.g., Cicippio,* 18 F.Supp.2d at 70 (awarding spouses $10 million each, where husbands were held hostage for 63 and 44 months); *Sutherland,* 151 F.Supp.2d at 51–52 (awarding spouse $10 million where husband held for six and a half years). However, given the shorter duration of Frank's time as a hostage, and given the Court's determination to award Frank $10,000 per day as a hostage for a total of $650,000, the Court believes that an award of $500,000 to Mary for her suffering during that time is more appropriate.

Mary also lost substantial income as a result of defendants' horrific acts, as her successful career as an academic at AUB was derailed and she was unable to find equivalent employment in the United States despite her efforts. According to Dr. Schiller, Mary's total economic damages were $2,508,526, including the loss of pension benefits. Exh. 46. The Court finds this figure to be a reasonable estimate of Mary's job-related loss. Accordingly, Mary is awarded $3,008,526 in compensatory damages.

## C. Punitive Damages

Plaintiffs also seek an award of punitive damages. Section 1606 of the FSIA provides that "[a]s to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances; but a foreign state *except for an agency or instrumentality thereof* shall not be liable for punitive damages." 28 U.S.C. § 1606 (emphasis supplied). Thus while the FSIA does not permit the award of punitive damages against a foreign state, *see Weinstein v. Islamic Republic of Iran,* 184 F.Supp.2d 13, 24 n. 1 (D.D.C.2002), it does allow such damages against an "agency or instrumentality" of the foreign state.

The FSIA defines "agency or instrumentality" of a foreign state as any entity

> (1) which is a separate legal person, corporate or otherwise, and

> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

> (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b). In several cases, courts have found MOIS liable for punitive damages as an "agency or instrumentality" of Iran in light of its role in funding, training, and directing Hizbollah in its terrorist activities in Lebanon. *See, e.g., Surette,* 231 F.Supp.2d at 273; *Weinstein,* 184 F.Supp.2d at 24 & n. 1; *Elahi,* 124 F.Supp.2d at 113–14. Consistent with this line of authority, plaintiffs here seek punitive damages not against Iran, but against

MOIS.[11] This issue is obviously an important one.

Since the evidentiary hearing in this matter, the D.C. Circuit has ruled that Iran's Ministry of Foreign Affairs "must be treated as the state of Iran itself rather than as its agent." *Roeder*, 333 F.3d at 234. In *Roeder*, the court was not considering the punitive damages provision in 28 U.S.C. § 1606, but rather was analyzing whether Iran's Ministry of Foreign Affairs was an "agent" of Iran for purposes of the Flatow Amendment. *Id.* at 234–35. The court referred to its earlier opinion in *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148 (D.C.Cir.1994), in which it adopted a "categorical approach" to the question whether, under the FSIA's service-of-process provisions, an entity is a "foreign state or political subdivision" as opposed to an "agency or instrumentality." The court held that "if the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state." *Roeder*, 333 F.3d at 234–35 (citing *Transaero*, 30 F.3d at 153). In *Transaero*, the D.C. Circuit, applying this categorical test, had concluded that the Bolivian Air Force, and, indeed, "armed forces . . . in all cases," must "be considered as the 'foreign state' itself rather than a separate 'agency or instrumentality' of the state" under 28 U.S.C. § 1603. 30 F.3d at 153. In *Roeder*, the court applied the categorical approach again—this time under a different provision of the FSIA—in concluding that Iran's Ministry of Foreign Affairs must be considered as Iran itself and could not be considered an agent of Iran because the conduct of foreign affairs "is an important and 'indispensable' governmental function." *Roeder*, 333 F.3d at 235 (citation omitted).

Notwithstanding the decision in *Roeder*, plaintiffs continue to argue that MOIS is an "agent or instrumentality" of Iran, contending that MOIS can be distinguished from Iran's Ministry of Foreign Affairs and the Bolivian Air Force because MOIS did not perform core and indispensable governmental functions. But the undisputed evidence is that MOIS served as "the revolution's secret police" and provided the "technical skills of terrorism" as an "apparatus of the Iranian government." Tr. Vol. I, 59:16–59:17, 60:7–60:13. Plaintiffs have presented no evidence to suggest that MOIS's activities in the early 1980s or, for that matter, the activities conducted by the MOIS today, had or have any commercial effect or purpose. Indeed, it is difficult to conceive how intelligence and security activities—in this case, providing training and support for terrorism abroad in order to advance Iran's political agenda—could be considered predominantly "commercial" rather than "governmental."

The Court is also not persuaded by plaintiffs' suggestion that MOIS should be considered an agent of Iran rather than Iran itself because it was not publicly named as an official ministry of the Iranian government until 1984—after Frank Regier's abduction. To the extent that the relevant inquiry under 28 U.S.C. § 1606 pertains to the status of MOIS at the time of the abduction rather than its status today, it remains the case that prior to 1984, MOIS, although "secret," was nevertheless "an official organization subordinate to another ministry." Tr. Vol. I, 59:19–59:21. Indeed, MOIS was merely a

---

11. Because the Court has concluded that the Flatow Amendment does not provide a cause of action against MOIS, *see* note 10 *supra*, MOIS's liability for punitive damages (if

MOIS were, indeed, an "agency or instrumentality" of Iran) would arise only with respect to claims asserted under state and/or federal common law.

continuation of the intelligence agency that had existed under the pre-revolutionary Iranian regime. Tr. Vol. I, 59:13–59:17. Thus it does not appear that MOIS was sufficiently distinct from Iran's government. An application of the categorical approach to the term "agency or instrumentality," as directed in *Roeder,* 333 F.3d at 234–35, and *Transaero,* 30 F.3d at 151–153, therefore leads inexorably to the conclusion that MOIS should be treated as the foreign state itself and hence cannot be liable for punitive damages under the language of §§ 1603(b) and 1606.

The Court notes that its ruling is consistent with the recent decision of Chief Judge Hogan in *Tracy v. Islamic Republic of Iran,* Civ. No. 01–2517, slip op. at 17 (D.D.C. August 21, 2003), concluding that *Roeder* precludes an award of punitive damages against MOIS. Nevertheless, the Court is also aware that its ruling is at odds with many pre-*Roeder* decisions of this Court and the recent post-*Roeder* decision of Judge Urbina in *Kilburn v. Republic of Iran,* Civ. No. 01–1301, 2003 WL 21982239 (D.D.C. August 8, 2003). In that case, Judge Urbina noted that "if the court were to strictly apply th[e] categorical approach, the result undoubtedly would be the court's denial of the plaintiff's punitive damages claim against defendant [Libyan External Security Organization]." *Id.* at *16. However, Judge Urbina "decide[d] not to strictly apply the categorical approach," reasoning that the D.C. Circuit's discussion of the distinction between the foreign state itself and an "agency or instrumentality" was framed as a "preliminary issue" in *Roeder,* and hence is dictum. *Id.* Judge Urbina further opined that he lacked the "heightened discretion" neces-

sary to deviate from the "tide of uniform rulings" in other cases in this Court awarding punitive damages against the security agencies of foreign states. *Id.* at *17. In this vein, Judge Urbina expressed particular concern that, "if the D.C. Circuit intended ... [the categorical] approach to apply across-the-board in all FSIA cases, then the vast number of cases allowing for such punitive damage claims would be called into question or flatly reversed, even where judgments have been entered and collection efforts on these judgments have been or are being advanced." *Id.* at *16.

This Court shares many of the same concerns expressed by Judge Urbina in *Kilburn,* and there is much to be said for his reasoning. Other judges have repeatedly found MOIS liable for punitive damages. *See, e.g., Cronin,* 238 F.Supp.2d at 235–36; *Surette,* 231 F.Supp.2d at 273–74; *Weinstein,* 184 F.Supp.2d at 25–26. Moreover, as Judge Urbina observed, Congress appears to "monitor[ ] the pulse of this area of law," *Kilburn,* 2003 WL 21982239, at *16 n. 17, yet has not taken definitive action "to alter the courts' interpretation authorizing punitive damages against foreign states' security agencies," *id.* at *16. As a more general matter, the extent of the efforts that Congress has made since 1996 to open the courts to plaintiffs seeking recourse for acts of state-sponsored terrorism (through, for example, the promulgation of 28 U.S.C. § 1605(a)(7) and the Flatow Amendment) might suggest that Congress would approve of judicial rulings punishing foreign intelligence agencies for participating in terrorist acts through the imposition of punitive damages.[12]

---

**12.** On the other hand, the passage of the Victims of Trafficking and Violence Protection Act of 2000, Pub.L. 106–386 § 2002(f)(2) (October 28, 2000), may actually reflect a congressional policy disfavoring the award of punitive damages in cases of state-sponsored terrorism. By way of background, between 1998 and 2000, the key language in 28 U.S.C. § 1606 provided that a "foreign state except for an agency or instrumentality thereof shall

But this Court must nevertheless respectfully disagree with Judge Urbina's conclusion that the D.C. Circuit's ruling in *Roeder* may be disregarded. Although the analysis of "agency or instrumentality" in *Roeder* pertained to a "preliminary issue," the analysis—which was the subject of an entire subpart of the court's opinion—was not dictum; it was a considered ruling on a distinct issue presented on appeal. *See Roeder*, 333 F.3d at 234–35; *see also id.* at 228 (noting that "several issues [were] presented on appeal"). Even if the relevant language in *Roeder* were dictum, moreover, this Court would still be constrained to apply the categorical approach by virtue of the force of the analysis in *Roeder* and the fact that the same approach was expressly adopted by the D.C. Circuit in *Transaero*. *See* 30 F.3d at 151.

Congress has specifically limited the availability of punitive damages in a § 1605(a)(7) case to an "agency or instrumentality" of a foreign state, *see* 28 U.S.C. § 1606, and has done so (as recently as 2000, *see* note 12 *supra* ) against the background that the D.C. Circuit uses a categorical approach for the interpretation of that term, *see Transaero*, 30 F.3d at 151. It is not the place of this Court to rewrite the language of § 1606 or to avoid D.C. Circuit precedent, despite the Court's sympathy for the plaintiffs here and the extraordinarily heinous nature of the conduct at issue in this and many other FSIA cases.

The Court reaches this conclusion reluctantly. There is no question that, in the broad scheme of things, punitive damages are warranted in this and similar cases against Iran and MOIS for the support and sponsorship of terrorism through bombings, killings, and hostage-taking, and this Court would not hesitate to award substantial punitive damages in this case. But Congress' language in §§ 1603(b) and 1606 and the D.C. Circuit's interpretation in *Roeder* and *Transaero* constrain this Court. Concerns about the implications of applying the categorical approach in the context of § 1606 are more appropriately addressed to Congress or the D.C. Circuit. Accordingly, this Court must deny plaintiffs' claim for punitive damages.

### *CONCLUSION*

For the foregoing reasons, final judgment will be entered in plaintiffs' favor and against defendants, in the amounts set forth above, by way of a separate Judgment Order issued pursuant to Rule 58 of the Federal Rules of Civil Procedure.

not be liable for punitive damages *except any action under section 1605(a)(7) or 1610(f)."* (emphasis supplied). Thus, punitive damages were recoverable in actions under those provisions against both state sponsors of terrorism and their agencies and instrumentalities. The Victims of Trafficking and Violence Protection Act of 2000, which provided partial payment of § 1605(a)(7) judgments in certain pending or concluded cases against Cuba and Iran, deleted the language in § 1606 provid-

ing for an exception to immunity for "any action under section 1605(a)(7) or 1610(f)." Thus, it may be that the reinstatement of immunity from punitive damages for actions under § 1605(a)(7) was a compromise of sorts—allowing collection of prior judgments in exchange for reinstated immunity against the future award of punitive damages. Counsel for plaintiffs has not briefed the issue, and the Court is reluctant to so conclude without any briefing.